Albert **HODGSON, Individually and as heir-at-law and personal representative of Monique Hodgson, Plaintiff,**

v.

**MISSISSIPPI DEPARTMENT OF CORRECTIONS, Eddie Lucas, Individually and as Commissioner, and Jo Bennett, Individually and as Administrator, Defendants.**

**No. 93–C–819.**

United States District Court,
E.D. Wisconsin.

April 30, 1997.

Karma S. Rodgers, Butler Rodgers Law Offices, Milwaukee, WI, for plaintiff.

John L. Clay, Geoffrey C. Morgan, Leonard C. Vincent, Mississippi Attorney General, Jackson, MS, for defendants.

## DECISION AND ORDER

CURRAN, District Judge.

Albert Hodgson commenced the above-captioned case seeking money damages for the loss of society and companionship of his minor daughter, Monique, who was murdered in Wisconsin by a parolee from Mississippi. Hodgson claims that the Mississippi Department of Corrections, its former Commissioner, Eddie Lucas, and its former Interstate Compact Administrator, Jo Bennett[1], caused his daughter's death by

---

1. Lucas and Bennett are being sued in their official as well as their personal capacities. The Defendants note that Lucas is no longer the Commissioner, *see* Memorandum Brief in Support of Defendants' Motion to Dismiss Plaintiff's Third Amended Complaint at 2 n. 1, and Bennett states that she is no longer the Interstate Compact Administrator, *see* Defendants' Motion to

failing to comply with the Uniform Act for Out-of-State Parolee Supervision[2] when John Bracey Smith, a parolee under their supervision, relocated to Wisconsin.[3] The Plaintiff summarizes the claims in his Third Amended Complaint as follows:

Dismiss Plaintiff's Third Amended Complaint at Exhibit 1 (Affidavit of Jo Bennett). The Plaintiff has not moved to substitute the present Commissioner or Administrator.

2. In 1942, Mississippi enacted the Uniform Act for Out-of-State Parolee Supervision which is codified at Section 47–7–71 of the Mississippi Code Annotated. This statute provides:

§ 47–7–71. Uniform act for out-of-state parolee supervision.

I. The governor of this state is hereby authorized and directed to execute a compact on behalf of the state of Mississippi with any of the United States legally joining therein in the form substantially as follows:

A Compact

Entered into by and among the contracting states, signatories herein, with the consent of the congress of the United States of America, granted by an act entitled "An act granting the consent of Congress to any two (2) or more states to enter into agreements or compacts for cooperative effort and mutual assistance in the prevention of crime and for other purposes." The contracting states solemnly agree:

(1) That it shall be competent for the duly constituted judicial and administrative authorities of a state party to this compact (herein called "sending state"), to permit any person convicted of an offense within such state and placed on probation or released on parole to reside in any other state party to this compact (herein called "receiving state"), while on probation or parole, if

(a) Such person is in fact a resident of or has his family residing within the receiving state and can obtain employment there;

(b) Though not a resident of the receiving state and not having his family residing there, the receiving state consents to such person being sent there.

Before granting such permission, opportunity shall be granted to the receiving state to investigate the home and prospective employment of such person.

A resident of the receiving state, within the meaning of this section, is one who has been an actual inhabitant of such state continuously for more than one (1) year prior to his coming to the sending state and has not resided within the sending state more than six (6) continuous months immediately preceding the commission of the offense for which he has been convicted.

(2) That each receiving state will assume the duties of visitation of and supervision over probationers or parolees of any sending state and in the exercise of those duties will be governed by the same standards that prevail for its own probationers and parolees.

(3) That duly accredited officers of a sending state may at all times enter a receiving state and there apprehend and retake any person on probation or parole. For that purpose no formalities will be required other than establishing the authority of the officer and the identity of the person to be retaken. All legal requirements to obtain extradition of fugitives from justice are hereby expressly waived on the part of states party hereto, as to such persons. The decision of the sending state to retake a person on probation or parole shall be conclusive upon and not reviewable within the receiving state: Provided, however, that if at the time when a state seeks to retake a probationer or parolee there should be pending against him within the receiving state any criminal charge, or he should be suspected of having committed within such state a criminal offense, he shall not be retaken without the consent of the receiving state until discharged from prosecution or from imprisonment for such offense.

(4) That the duly accredited officers of the sending state will be permitted to transport prisoners being retaken through any and all state parties to this compact, without interference.

(5) That the governor of each state may designate an officer who, acting jointly with like officers of other contracting states, if and when appointed, shall promulgate such rules and regulations as may be deemed necessary to more effectively carry out the terms of this compact.

(6) That this compact shall become operative immediately upon its execution by any state as between it and any other state or states so executing. When executed it shall have the full force and effect of law within such state, the form of execution to be in accordance with the laws of the executing state.

(7) That this compact shall continue in force and remain binding upon each executing state until renounced by it. The duties and obligations hereunder of a renouncing state shall continue as to parolees or probationers residing therein at the time of withdrawal until retaken or finally discharged by the sending state. Renunciation of this compact shall be by the same authority which executed it, by sending six (6) months' notice in writing of its intention to withdraw from the compact to the other state party hereto.

II. This section may be cited as the uniform act for out-of state parolee supervision.

Miss.Code Ann. § 47–7–71.

In 1939, Wisconsin enacted the Uniform Act which is codified at Section 304.13 of the Wisconsin Statutes.

3. The court notes that the Defendants have answered one of the Plaintiff's interrogatories by asserting that John Bracey Smith left Mississippi on or about April 25, 1992, on a travel permit and not pursuant to provisions of the Uniform

1. For wrongful death:

 a. Against the Mississippi Department of Corrections;

 b. Against Eddie Lucas in his official capacity;

 c. Against Jo Bennett in her official capacity.

2. For denial of civil rights under 42 U.S.C.1983:

 a. Against Eddie Lucas individually;

 b. Against Jo Bennett individually.

Brief Opposing Revised and Comprehensive Motion to Dismiss at 5. Hodgson maintains that this court has diversity and federal question jurisdiction over the subject matter of his claims. *See* 28 U.S.C. § § 1331 & 1332.

The Defendants have answered and denied liability. After their prior motions to dismiss were not resolved on the merits because the Plaintiff's motions to amend his complaint were granted, they once again moved to dismiss the Third Amended Complaint. The Defendants have raised affirmative defenses of Eleventh Amendment immunity, qualified immunity and lack of personal jurisdiction which are dispositive of Hodgson's action in this court. *See* Federal Rule of Civil Procedure 12(b).

## I. *WRONGFUL DEATH*

## A. ELEVENTH AMENDMENT

### 1. *IMMUNITY*

This is a case in which a citizen of Wisconsin is attempting to sue an agency and two officials of another state. Under these circumstances, the Defendants contend that the claims against the Mississippi Department of Corrections and against the individuals in their official capacities are barred by the immunity conferred upon states by the Eleventh Amendment to the United States Constitution, which provides that:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any foreign state.

U.S. Const. amend. XI.

The Seventh Circuit considers Eleventh Amendment immunity to be a jurisdictional bar. *See Crosetto v. State Bar of Wisconsin,* 12 F.3d 1396, 1401 & n. 8 (7th Cir.1993), *cert. denied,* 511 U.S. 1129, 114 S.Ct. 2138, 128 L.Ed.2d 867 (1994). "When ruling on a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), the court must accept as true all well-pleaded factual allegations and draw reasonable inferences in favor of the plaintiff." *Ezekiel v. Michel,* 66 F.3d 894, 897 (7th Cir.1995). Parties asserting that they are entitled to Eleventh Amendment immunity have the burden of proving their immunity by a preponderance of the evidence. *See Deep Sea Research, Inc. v. The Brother Jonathan,* 102 F.3d 379, 386 (9th Cir.1996), *petition for cert. filed,* 65 U.S.L.W. 3631 (U.S. March 4, 1997) (No. 96–1400); *ITSI TV Productions, Inc. v. Agricultural Associations,* 3 F.3d 1289, 1292 (9th Cir.1993). In resolving a motion to dismiss based upon a claim of sovereign immunity or lack of subject matter jurisdiction, the court must accept the Complaint's well-pleaded factual allegations as true and draw reasonable inferences from these allegations in the Plaintiff's favor. *See Rueth v. EPA,* 13 F.3d 227, 229 (7th Cir.1993). The parties here, however, also submitted evidentiary materials addressed to the sovereign immunity question. In such a case, the district court may properly look beyond the jurisdictional allegations of the Complaint and view whatever evidence has been submitted on the issue to determine whether the Defendants

---

Act for Out–of–State Parolee Supervision. *See* Defendants' Responses to Plaintiff's First Set of Interrogatories at Answer to Interrogatory 6. Moreover, Defendant Bennett declares that she never received a transfer request from John Bracey Smith. *See* Defendants' Motion to Dismiss Plaintiff's Third Amended Complaint at Exhibit 1

(Affidavit of Jo Bennett at ¶ 2). A transfer request must be received before proceedings are initiated under the Uniform Act for Out–of–State Parolee Supervision. Nevertheless, for purposes of resolving this motion, the court will assume that the Uniform Act applied to Smith's presence in Wisconsin

are entitled to immunity. *See Capitol Leasing Co. v. FDIC,* 999 F.2d 188, 191 (7th Cir.1993).

■■■ The scope of Eleventh Amendment immunity is a question of federal law. *See Miller–Davis Company v. Illinois State Toll Highway Authority,* 567 F.2d 323, 330 (7th Cir.1977). Although the language of the Eleventh Amendment refers only to the State itself, the Supreme Court has held that it also bars actions against a state agency in federal court for money damages when "the state is the real, substantial party in interest." *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 101, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984). A state agency is entitled to the same Eleventh Amendment immunity enjoyed by the State itself when a judgment against the agency "would have had essentially the same practical consequences as a judgment against the State itself." *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 401, 99 S.Ct. 1171, 1177, 59 L.Ed.2d 401 (1979).

In *Benning v. Board of Regents of Regency Universities,* 928 F.2d 775 (7th Cir.1991), the Seventh Circuit explained the factors which should be considered in determining whether a state entity is an arm of the state:

> In determining whether a state entity should be dealt with as an arm of the sovereign, the critical inquiry is whether a judgment would deplete the state treasury. *See Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974) ("a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment"); *Dugan v. Rank,* 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963) ("The general rule is that a suit is against the sovereign if 'the judgment would expend itself on the public treasury or domain ....'" (quoting *Land v. Dollar,* 330 U.S. 731, 738, 67 S.Ct. 1009, 1012, 91 L.Ed. 1209 (1947))). Other factors to consider are whether the state entity can sue and be sued, whether it per-

forms an essential governmental function and whether it enjoys a substantial degree of political independence from the state. *See Ranyard v. Board of Regents,* 708 F.2d 1235, 1238 (7th Cir.1983).

*Benning v. Board of Regents of Regency Universities,* 928 F.2d at 777. *See also Thiel v. State Bar of Wisconsin,* 94 F.3d 399, 400–02 (7th Cir.1996); *Crosetto v. State Bar of Wisconsin,* 12 F.3d 1396, 1401–03 (7th Cir. 1993), *cert. denied,* 511 U.S. 1129, 114 S.Ct. 2138, 128 L.Ed.2d 867 (1994).

■■■ In this case, the Plaintiff is suing the Mississippi Department of Corrections, which the Defendants contend is an arm of the State of Mississippi. Thus, the court must determine whether the Defendants have met their burden of establishing Eleventh Amendment immunity for the Department under the legal principles set forth in *Benning.*

Chapter 5 of Title 47 of the Mississippi Code, entitled "Correctional System Operation, Management and Personnel," sets forth the powers and duties of the Department of Corrections. *See* Miss.Code Ann. § § 47–5–1 to 47–5–805. The enumerated powers and duties reveal that the Department performs the normal and essential governmental function of administering state correctional facilities for adult offenders and services for parolees. *See* Miss.Code Ann. § 47–5–10. The chapter does not accord the Department independent status.

While Mississippi has evinced a policy objective of having its prison system be self-sustaining by utilizing inmates for prison construction, *see* Miss.Code Ann. § 47–5–1, any monetary recovery made by a claimant such as Hodgson would have to be paid from the state's general revenues. *See* Defendants' Revised and Comprehensive Motion to Dismiss at Exhibit A (Affidavit of David Mitchell) & Exhibit B (Affidavit of Edward L. Ranck). *See also* Miss.Code Ann. § 7–9–21 (1972). And, although it appears that the Department can be sued in Mississippi state courts,[4] *see* Miss.Code Ann. § 47–5–805, the

---

4. A state's or state agency's consent to be sued in state court cannot override sovereign immunity unless the state specifies its intention to subject itself to suit in federal court. *See Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 241, 105 S.Ct. 3142, 3146–47, 87 L.Ed.2d 171 (1985);

Plaintiff has cited no federal case involving a tort suit against the Department or its officials that was found permissible under the Eleventh Amendment. Based upon this showing, the court concludes that the Mississippi Department of Corrections is an arm of the state and is entitled to Eleventh Amendment immunity.[5] *See Adden v. Middlebrooks,* 688 F.2d 1147, 1153–54 (7th Cir.1982) (holding that the Department of Corrections of the State of Louisiana is an arm of the state entitled to Eleventh Amendment immunity). In the absence of waiver, Hodgson is barred from suing the Department for money damages in federal court. *See generally Papasan v. Allain,* 478 U.S. 265, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *Brunken v. Lance,* 807 F.2d 1325 (7th Cir.1986).

Defendants Eddie Lucas and Jo Bennett, sued in their official capacities, are also protected by the Eleventh Amendment. *See Walker v. Rowe,* 791 F.2d 507, 508 (7th Cir.), *cert. denied,* 479 U.S. 994, 107 S.Ct. 597, 93 L.Ed.2d 597 (1986); *Jensen v. State Board of Tax Commissioners of the State of Indiana,* 763 F.2d 272, 276 (7th Cir.1985). The Seventh Circuit has explained that "a suit against a public servant 'in his official capacity' imposes liability on the entity he represents," and therefore, is a suit against the state, barred by the Eleventh Amendment. *Darryl H. v. Coler,* 801 F.2d 893, 906 (7th Cir.1986).

### 2. *ABROGATION*

Even though the court has determined that the Mississippi Department of Corrections and Eddie Lucas and Jo Bennett in their official capacities fall within the purview of Eleventh Amendment immunity, this immunity is not absolute. The Eleventh Amendment operates to prohibit suits against states in federal courts unless Congress has unequivocally expressed its intent to abrogate the immunity and does so through a valid exercise of power or unless the state has waived its immunity in unequivocal terms. *See Vickery v. Jones,* 100 F.3d 1334, 1346 (7th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1553, —— L.Ed.2d —— (1997) . Thus, the court must next determine whether Congress has lawfully abrogated Mississippi's Eleventh Amendment immunity.

The Plaintiff suggests that Congress abrogated the immunity of the states for purposes of implementing the Uniform Act for Out-of-State Parolee Supervision when it enacted the Crime Control Consent Act of 1934,[6] which gave advance consent to forming interstate compacts. The Crime Control Consent Act, promulgated pursuant to the Commerce Clause in Article I of the United States Constitution, provides, in part, that:

> The consent of Congress is hereby given to any two or more States to enter into agreements or compacts for cooperative effort and mutual assistance in the prevention of crime and in the enforcement of their respective criminal laws and policies. . . .

4 U.S.C. § 112(a).

While this lawsuit has been pending, the United States Supreme Court issued a series of opinions which have developed Eleventh Amendment jurisprudence in aspects relevant to the *Hodgson* case. Last Term, the Court found that Congress' power to abrogate a state's immunity is limited to instances in which it is passing legislation to enforce the Fourteenth Amendment. *See Seminole Tribe of Florida v. Florida,* —— U.S. ——,

---

*Kroll v. Board of Trustees of the University of Illinois,* 934 F.2d 904, 909–10 (7th Cir.), *cert. denied,* 502 U.S. 941, 112 S.Ct. 377, 116 L.Ed.2d 329 (1991).

**5.** When a state is the real party in interest, diversity jurisdiction does not exist because a state is not a "citizen" within the meaning of 28 U.S.C. § 1 332. *See State Highway Commission v. Utah Construction Company,* 278 U.S. 194, 200, 49 S.Ct. 104, 106, 73 L.Ed. 262 (1929); *Adden v. Middlebrooks,* 688 F.2d 1147, 1150 (7th Cir. 1982). Therefore, in the *Hodgson* case, lack of

diversity jurisdiction is an alternate ground for dismissal of the Plaintiff's wrongful death claim against the Department of Corrections and Lucas and Bennett in their official capacities.

**6.** The Compact Clause in the United States Constitution forbids states from entering into any agreement or compact with one another without the consent of Congress. *See* U.S. Const., art. I, § 10, cl. 3. Congress may, however, give its consent in advance of an agreement. *See Pitsonbarger v. Gramley,* 103 F.3d 1293, 1300 (7th Cir. 1996).

——, 116 S.Ct. 1114, 1125, 134 L.Ed.2d 252 (1996). In *Seminole Tribe of Florida v, Florida,* the Court overruled its plurality holding in *Pennsylvania v. Union Gas Company,* 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), by holding that "notwithstanding Congress' clear intent to abrogate the States" sovereign immunity, the Commerce Clause [7] does not grant Congress that power and cannot grant jurisdiction over a state that does not consent to be sued. *See Seminole Tribe,* —— U.S. at ——, 116 S.Ct. at 1119. Therefore, because Congress passed the Crime Control Consent Act and approved the Uniform Act for Out-of-State Parolee Supervision pursuant to the Commerce Clause, it could not abrogate Mississippi's immunity by a valid exercise of power.

### 3. *WAIVER*

█ The Plaintiff next argues that Mississippi waived its own Eleventh Amendment immunity when it joined an interstate compact by enacting the Uniform Act for Out-of-State Parolee Supervision Act. *See* Miss.Code Ann. § 46-7-71. Unlike other forms of subject-matter jurisdiction, Eleventh Amendment immunity can be waived by consent. *See Parden v. Terminal Railway of Alabama State Docks Department,* 377 U.S. 184, 192-93, 84 S.Ct. 1207, 1212-13, 12 L.Ed.2d 233 (1964), *overruled on other grounds by Welch v. Texas Department of Highways and Public Transportation,* 483 U.S. 468, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987); *Petty v. Tennessee—Missouri Bridge Commission,* 359 U.S. 275, 277-82 & n. 7, 79 S.Ct. 785, 787-90 & n. 7, 3 L.Ed.2d 804 (1959). The Plaintiff believes that a state's waiver of sov-

ereign immunity can be inferred whenever an interstate compact is involved to which Congress has given its consent. He bases his argument on the opinion in *Cuyler v. Adams,* 449 U.S. 433, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981), where the Supreme Court held that, because Congress had consented to the Interstate Agreement on Detainers and Uniform Criminal Extradition Act—another interstate compact—by virtue of the Crime Control Consent Act, interpretation of that interstate compact presented a question of federal law. *See Id.* at 442, 101 S.Ct. at 708-09.

Hodgson believes that the same Crime Control Consent Act gave pre-approval to the Uniform Act for Out-of-State Parolee Supervision and that the Uniform Act is also a federal law.[8] The Plaintiff then concludes that any state which enacted the Uniform Act waived its sovereign immunity.

█ There are a number of fatal flaws in the Plaintiff's argument. First, the Plaintiff has not used the correct test for a state's waiver. A state's adoption of a Congressionally approved interstate compact does not automatically imply waiver of its sovereign immunity.

█ The Supreme Court repeatedly has admonished that "[t]he test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one." *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 241, 105 S.Ct. 3142, 3146, 87 L.Ed.2d 171 (1985). A state may waive its Eleventh Amendment immunity either expressly in a statutory or constitutional provi-

---

**7.** Although *Seminole Tribe* addressed an action brought under the Indian Commerce Clause, Chief Justice Rhenquist rejected the notion that Congress could abrogate states' Eleventh Amendment immunity by legislating pursuant to any other Article I power, including the Interstate Commerce Clause. *See Seminole Tribe,* —— U.S. at —— ——, 116 S.Ct. at 1131-32.

**8.** The Plaintiff posits that, if the Uniform Act is federal law, the court has federal question jurisdiction over his wrongful death claim and that this forecloses an Eleventh Amendment immunity defense. This is contrary to Supreme Court precedent. The Court has ruled that: "Relief that in essence serves to compensate a party injured in the past by an action of a state official in his official capacity that was illegal under

federal law is barred [by the Eleventh Amendment] even when the state official is the named defendant." *Papasan v. Allain,* 478 U.S. 265, 278, 106 S.Ct. 2932, 2940, 92 L.Ed.2d 209 (1986)(footnote omitted).

In *Ex parte Young,* 209 U.S. 123, 159-160, 28 S.Ct. 441, 453-54, 52 L.Ed. 714, the Supreme Court created an exception to the general prohibition on suits by citizens against states or state officials when the citizen seeks prospective injunctive relief for an ongoing or threatened violation of federal law. *See Seminole Tribe v. Florida,* —— U.S. ——, ——, 116 S.Ct. 1114, 1132, 134 L.Ed.2d 252 (1996). The *Ex parte Young* exception does not apply in this case where the Plaintiff is seeking only money damages.

sion or by clear state conduct. *See Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 238 & n. 1, 105 S.Ct. 3142, 3145 & n. 1, 87 L.Ed.2d 171 (1985). A state statutory or constitutional provision will be found to constitute a waiver of Eleventh Amendment immunity only when it "specif[ies] the State's intention to subject itself to suit in *federal court* 'in the most express language or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction.'" *Port Authority Trans-Hudson Corporation v. Feeney,* 495 U.S. 299, 305–06, 110 S.Ct. 1868, 1873, 109 L.Ed.2d 264 (1990)(quoting *Atascadero State Hospital,* 473 U.S. at 239–40, 105 S.Ct. at 3146 (emphasis in original)). *See also Kroll v. Board of Trustees of University of Illinois,* 934 F2d 904, 907 (7th Cir.)(intent to waive must be explicit and unequivocal), *cert. denied,* 502 U.S. 941, 112 S.Ct. 377, 116 L.Ed.2d 329 (1991). Faced with these legal standards, Hodgson has utterly failed to point to any Mississippi statute, constitutional provision, statement of policy, or action which explicitly and unequivocally sets forth a waiver of Eleventh Amendment immunity on the part of the State of Mississippi.

A state can also waive its immunity implicitly by voluntarily participating in a federal program when Congress has expressly conditioned state participation in that program on the state's consent to suit in federal court. *See, e.g., Westinghouse Electric Corporation v. West Virginia Department of Highways,* 845 F.2d 468, 470 (4th Cir.), *cert. denied,* 488 U.S. 855, 109 S.Ct. 143, 102 L.Ed.2d 116 (1988). However, a state's participation in a federal program or interstate compact does not automatically imply a consent to be sued for actions arising under that program. *See Florida Department of Health & Rehabilitative Services v. Florida Nursing Home Association,* 450 U.S. 147, 150, 101 S.Ct. 1032, 1034–35, 67 L.Ed.2d 132 (1981) (per curiam); *Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 1360–61, 39 L.Ed.2d 662 (1974). Here, the Plaintiff has pointed to nothing in the Crime Control Consent Act or the Uniform Act for Out–of–State Parolee Supervision which provides that any state joining the compact waives its Eleventh Amendment immunity to suit in federal court, so the court cannot find waiver on this ground.

Finally, a state's invocation of the federal court's power to adjudicate its rights could give rise to a waiver, but this record is devoid of any evidence that Mississippi has initiated legal proceedings or consented to suit in federal court based on any provision of the Uniform Act. Under these circumstances, the court finds that Mississippi has not waived its Eleventh Amendment immunity or that of its Department of Corrections or its officials. Therefore the Plaintiff's wrongful death claim and any other common-law or state law claims the Plaintiff is asserting are barred in federal court against the Mississippi Department of Corrections and against Lucas and Bennett in their official capacities.

## B. STATE SOVEREIGN IMMUNITY

As an additional ground for dismissal of the state law wrongful death claim, the Defendants argue that, as a matter of Mississippi law, they are entitled to state sovereign immunity from all tort claims. This presents a threshold question of which version of Mississippi law to apply. That state's law of sovereign immunity has had a complicated history over the past fifteen years. Recently, the Fifth Circuit summarized the situation as follows:

In *Pruett v. City of Rosedale,* 421 So.2d 1046, 1050 (Miss.1982) (en banc), the Mississippi Supreme Court abolished the judicial doctrine of sovereign immunity. *Pruett,* however, specifically provided that its holding would not take effect until 1984. *See* Miss.Code Ann. §§ 11–46–1–23 (Supp. 1995). The Act mandated that its provisions would not apply to claims accruing prior to 1985; claims accruing prior to 1985 would be governed by pre-*Pruett* law. Interestingly, the substantive provisions of the Sovereign Immunity Act did not take effect until after 1993 because each successive legislature moved the effective date of the Act forward to the next year and specifically provided that pre-*Pruett* law should continue to control prior to the effective date of the Act. *See Presley v. Mississippi State Highway Comm'n,* 608

So.2d 1288, 1292–94 (Miss.1992); *Wesley v. Mississippi Transp. Comm'n,* 857 F.Supp. 523, 527–30 (S.D.Miss.1994).

Ultimately, in *Presley,* the Mississippi Supreme Court held that the portion of the Immunity Act requiring courts to apply pre-*Pruett* law was unconstitutional. Followingg *Presley,* the legislature amended the Act in 1993 to delete the offensive provision; this Act is currently in force today. *See* Miss.Code Ann. § § 11–46–1–23 (Supp.1995). However, the Mississippi Supreme Court subsequently held that *Presley* should only be applied prospectively. *Robinson v. Stewart,* 655 So.2d 866, 868 (Miss.1995) (en banc) ("*Presley* has no retroactive application.").

Since *Presley* is not retroactive, the Sovereign Immunity Act of 1984 as subsequently amended governs during the post-*Pruett* and pre-*Presley* period. Consequently, pre-*Pruett* sovereign immunity law, as mandated by the Act, applies. *See Mohundro v. Alcorn County,* 1995 WL 598828, at *4 (Miss. Oct.12, 1995); *West v. Combs,* 642 So.2d 917, 920 (Miss.1994); *Morgan v. City of Ruleville,* 627 So.2d 275, 278–79 (Miss.1993); *Wesley,* 857 F.Supp. at 528, 530; *Newsom v. Stanciel,* 850 F.Supp. 507, 515 (N.D.Miss.1994).

*FYCA Industries, Inc. v. Harrison County Waste Water Management District,* 81 F.3d 1412, 1418 (5th Cir.1996). *See also Mohundro v. Alcorn County,* 675 So.2d 848, 851 (Miss.1996).

■ The wrongful death claim in this lawsuit arose on August 4, 1992—the day Monique Hodgson was murdered. The *Presley* decision was issued on August 31, 1992. Thus, Hodgson's cause of action arose during the post-*Pruett* and pre-*Presley* gap, so the state sovereign immunity issue is controlled by pre-*Pruett* Mississippi law.

Under pre-*Pruett* law, the State and its agencies were immune from suit unless immunity was waived by statute. *See Grantham v. Mississippi Department of Correc-*

tions, 522 So.2d 219, 222 (Miss.1988). The court has concluded that Mississippi did not waive its sovereign immunity by enacting the Uniform Act for Out–of–State Parolee Supervision and the Plaintiff has cited no other statute evincing waiver on the part of the state. Therefore, the Mississippi Department of Corrections has state sovereign immunity from suit for the wrongful death of Monique Hodgson.

■ Defendants Lucas and Bennett argue that, as Mississippi officials engaged in official duties,[9] they are also entitled to state sovereign immunity from suit. The Plaintiff, in turn, maintains that they are not entitled to state immunity because they were performing ministerial acts. The *Pruett* decision abolished the doctrine of sovereign immunity as it applied to ministerial acts, leaving immunity only for discretionary acts. The Mississippi Supreme Court emphasized that:

> [w]e do not abolish by this opinion the historical and well-recognized principle of immunity granted to all legislative, judicial and executive bodies and those public officials who are vested with discretionary authority, which principle of immunity rests upon an entirely different basis, and is left intact by this decision.

*Pruett v. City of Rosedale,* 421 So.2d 1046, 1052 (Miss.1982).

In *Sorey v. Kellett,* 849 F.2d 960 (5th Cir. 1988), a Mississippi case which arose in the post-*Pruett* and pre-*Presley* gap, the Fifth Circuit further explained that:

> In Mississippi, public officials sued in their individual capacities have a limited, qualified immunity that extends to "discretionary," not to "ministerial" acts. *Davis v. Little,* 362 So.2d 642, 643 (Miss.1978). A discretionary act is one requiring "personal deliberation, decision and judgment." *Id.* (quoting W. Prosser, Law of Torts § 132 (4th ed.1971)). A ministerial act, by contrast, is one "positively imposed by law and its performance required at a time and in a

---

**9.** It is clear that the Commissioner of Corrections is a "public official" for purposes of immunity. Mississippi has created that office by statute. The official powers and duties of the Mississippi

Commissioner of Corrections are found throughout Title 47 of the Mississippi Code and particularly in section 47–5–20.

manner or upon conditions which are specifically designated, the duty to perform under the conditions specified not being dependent upon the officer's judgment or discretion." *Poyner v. Gilmore*, 171 Miss. 859, 864, 158 So. 922, 923 (1935).

*Sorey v. Kellett*, 849 F.2d at 963. The Fifth Circuit also observed that the Mississippi Supreme Court had rejected a narrow view of discretionary action and had held that "the discretion given to the defendants applied not only to decisions with reference to instituting a program ..., but also to ... in carrying out such policies." *Id.* (quoting *Hudson v. Rausa*, 462 So.2d 689, 695 (Miss. 1984)).

Hodgson attempts to characterize the Uniform Act for Out-of-State Parolee Supervision's provision requiring notification of a receiving state by a sending state as a ministerial duty. *See* Brief Opposing Revised and Comprehensive Motion to Dismiss at 24. However, the court must reject the Plaintiff's theory. His reasoning artificially isolates a single step in the process of choosing and sending probationers and parolees to other states under the compact. The statutory obligations found in the Uniform Act are defined in such a way that they cannot be met without the exercise of judgment. The Act explicitly vests the implementing officials with the discretion to determine which parolees and probationers are eligible to reside in other states and which prisoners to retake and transport should such steps become necessary. Given these circumstances, the court concludes that the acts or omissions of Lucas and Bennett complained of in this case can only be characterized as discretionary. Interpreting Mississippi law, the Fifth Circuit has observed that: "a public official charged only with general authority over a program

or institution naturally is exercising discretionary functions. With no more particularized connection to the plaintiff's injury, such an official will be immune from individual liability under Mississippi law." *Sorey v. Kellett*, 849 F.2d at 964. This describes the situation of Lucas and Bennett as shown by the allegations and affidavits now in the record. Therefore, Mississippi's applicable law of sovereign immunity provides a complete defense to suit to the two state officials on all Hodgson's common-law or state law claims.

## II. *SECTION 1983*

For his second cause of action, Hodgson seeks to impose liability pursuant to 42 U.S.C. § 1983 on Defendants Lucas and Bennett in their individual or personal capacities for violating his rights under the Fourteenth Amendment. Unlike official capacity suits, personal capacity suits "impose personal liability upon governmental officials for actions [they take] under the color of state law." *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). Because personal capacity suits can be executed only against an official's personal assets, personal capacity suits do not extend any form of liability to the State, so the Eleventh Amendment is not implicated even though the named defendant is a public official and acted under color of state law. *See Papasan v. Allain*, 478 U.S. 265, 278 n. 11, 106 S.Ct. 2932, 2940 n. 11, 92 L.Ed.2d 209 (1986); *Scheuer v. Rhodes*, 416 U.S. 232. 237–39, 94 S.Ct. 1683, 1686–88, 40 L.Ed.2d 90 (1974). Thus, there is no jurisdictional bar to a personal capacity suit in federal court.

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that: (1) the defendants deprived him of a right secured by the Constitution or laws of the United States,[10] and (2) the defendants acted under

---

**10.** A Plaintiff must also prove that the individual Defendants were personally involved in the alleged deprivations of civil rights. *Respondeat superior* liability is not sufficient in a section 1983 action. *See Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir.1988). Hodgson seeks, in part, to hold Lucas and Bennett liable as supervisors. However, supervisory liability will be found only if the supervisor, with knowledge of the subordinate's conduct, approved the conduct and the basis for it. *See Kernats v. O'Sullivan*, 35 F.3d 1171, 1182 (7th Cir.1994). "[S]upervisors

who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable, because negligence is no longer culpable under § 1983." *Jones*, 856 F.2d at 992. Gross negligence is also not enough to impose supervisory liability. Rather, "supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference." *Id.* at 992–93.

color of state law. *See Reed v. City of Chicago,* 77 F.3d 1049, 1051 (7th Cir.1996). In this case, the Defendants do not contest that they acted or failed to act under color of state law. However, even though the Plaintiff has amended his Complaint three times, it is still far from clear what rights he is attempting to enforce through his Fourteenth Amendment claim. There are two possibilities: (1) a claim for violation of the Uniform Act for Out–of–State Parolee Supervision, or (2) a claim for deprivation of substantive due process.

## A. PRIVATE RIGHT OF ACTION

■ As discussed above, the Plaintiff's position is that the Uniform Act for Out–of–State Parolee Supervision is a federal law [11]

Despite being given a period of time for discovery on the issue of whether Lucas and Bennett were personally involved in the decision not to warn Wisconsin authorities that John Bracey Smith was relocating there, see Order of April 8, 1994, the Plaintiff has submitted little more than conclusory or speculative allegations. The record is still insufficient for the court to conclude that these Defendants were personally involved. Because the Defendants' motion can be resolved on other grounds, a ruling on this issue is not necessary to this decision.

11. A compact will not become federal law simply because Congress enacts consent legislation. The historical practice of states in submitting multilateral compacts for congressional approval "may simply reflect considerations of caution and convenience on the part of submitting states, but it is not controlling." *United States Steel Corporation v. Multistate Tax Commission,* 434 U.S. 452, 471, 98 S.Ct. 799, 812, 54 L.Ed.2d 682 (1978). The agreement must also be an appropriate subject for congressional legislation. *See Cuyler v. Adams,* 449 U.S. 433, 440, 101 S.Ct. 703, 707–08, 66 L.Ed.2d 641 (1981).

No federal court has held that the Uniform Act for Out–of–State Parolee Supervision is federal law, but courts have held that another interstate compact, the Interstate Agreement on Detainers (IAD), which was pre-approved by the Crime Control Consent Act, 4 U.S.C. § 112, comprises federal law for purposes of prisoners seeking relief pursuant to 42 U.S.C. § 1983 or seeking a writ of habeas corpus. *See Reed v. Farley,* 512 U.S. 339, 346, 114 S.Ct. 2291, 2296, 129 L.Ed.2d 277 (1994) (IAD is state law and law of the United States as well). *Cross v. Cunningham,* 87 F.3d 586, 588 (1st Cir.1996) (prisoner could seek injunctive relief under section 1983 requiring officials to comply with IAD); *Webb v. Keohane,* 804 F.2d 413, 414 (7th Cir.1986) (rights contained in IAD are federal statutory rights cognizable in a federal habeas petition). *But see Stew-*

which can be enforced through 42 U.S.C. § 1983.[12] The Defendants, in turn, contend that a plaintiff such as Hodgson has no private right of action under the Uniform Act.

■ A mere violation of federal law will not support a section 1983 claim. Section 1983 can be used to enforce a federal statute only if the statute creates a federal right. *See Blessing v. Freestone,* —— U.S. ——, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997). Three principal factors determine whether a statutory provision creates a privately enforceable right: (1) whether the plaintiff is an intended beneficiary of the statute; (2) whether the plaintiff's asserted interests are not so vague and amorphous as to be beyond the competence of the judiciary to enforce;

*art v. McManus,* 924 F.2d 138, 142 (8th Cir.1991) (Interstate Corrections Compact not federal law for purposes of a prisoner seeking relief under 42 U.S.C. § 1983 because no federal interest exists in a state's transfer of inmates to another state); *Griffin v. Riveland,* 148 F.R.D. 266, 269 (E.D.Wash.1993) (prisoner's section 1983 action predicated upon violations of Western Interstate Corrections Compact dismissed; even if Congress consented to the pact, consent is only one prong of the test for federalization; unlike the IAD, this compact is not an appropriate subject for congressional legislation).

12. In an attempt to refine the legal underpinnings of his claims or to stave off dismissal as a matter of law, the Plaintiff has made the nature of his claims a moving target. After arguing that the Uniform Act for Out–of–State Parolee Supervision is federal law and, therefore, provides a predicate for federal question jurisdiction, the Plaintiff shifts his position later in the same brief stating:

By raising the issue whether the Interstate Compact creates a federal cause of action, Defendants have finally trenched upon Plaintiff's theory of liability in this action. Briefly put, we do not contend that the Interstate Compact creates a cause of action where there was none at common law. Rather, the duty to warn and to supervise concerning dangerous conditions or persons exists at common law, and it is precisely this kind of concern that led to the enactment of the Interstate Compact. All that the Interstate Compact has done is to impose these duties in a specific circumstance, i.e., when a prisoner requests a change of residence to another state.

Brief Opposing Revised and Comprehensive Motion to Dismiss at 16.

Because the Plaintiff continues to claim federal question subject matter jurisdiction by virtue of the Uniform Act, the court has proceeded with its private-right-of-action analysis.

and (3) whether the statute imposes a binding obligation on the state. *See Blessing v. Freestone,* —— U.S. ——, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997). *See also Wilder v. Virginia Hospital Association,* 496 U.S. 498, 508, 110 S.Ct. 2510, 2516–17, 110 L.Ed.2d 455 (1990); *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 15–16, 100 S.Ct. 242, 245–46, 62 L.Ed.2d 146 (1979). Thus, in order to prevail on his section 1983 claim based upon an alleged violation of the Uniform Act for Out–of–State Parolee Supervision, Hodgson must establish that the Uniform Act was enacted for the benefit of persons in the position of himself and his daughter Monique.

■■■ To determine whether a statute creates a private right of action in favor of a particular plaintiff, a court must analyze the statute itself and any relevant legislative history. *See Suter v. Artist M.,* 503 U.S. 347, 363, 112 S.Ct. 1360, 1370, 118 L.Ed.2d 1 (1992). The focal point is the legislative body's intent in enacting the statute. *See Thompson v. Thompson,* 484 U.S. 174, 179, 108 S.Ct. 513, 516, 98 L.Ed.2d 512 (1988). Unless the legislative intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist. *See Id.*

■■■ In this case, nothing points in favor of implying a private right of action for Hodgson. The Uniform Act itself contains no statement of purpose or mention of the rights of the general public or potential victims of parolees or probationers who might relocate under the Act's provisions. At the same time, the Plaintiff has failed to point to any record of legislative history which shows that the lawmakers intended to benefit persons such as Hodgson or his daughter.

Based upon this record, the court concludes that neither the United States Congress nor the legislatures of Mississippi and

Wisconsin unambiguously conferred upon persons such as Hodgson and his daughter the right to enforce any rights, privileges or immunities under the Uniform Act for Out–of–State Parolee Supervision. Therefore, the Plaintiff cannot enforce the Uniform Act under Section 1983. *See Wright v. Roanoke Redevelopment and Housing Authority,* 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987).

## B. QUALIFIED IMMUNITY

■■■ Next, the court will consider whether Defendants Lucas and Bennett can be sued in their personal capacities under 42 U.S.C. § 1983 for their alleged failure to supervise, to warn, or to follow the dictates of the Uniform Act for Out–of–State Parolee Supervision, thereby allowing parolee John Bracey Smith to relocate in Wisconsin where he killed the Plaintiff's daughter. This type of claim could be encompassed by the guarantee of substantive due process which courts have found in the Fourteenth Amendment. The Defendants, however, insist that this claim be dismissed on the ground that they are entitled to qualified immunity from suit.[13]

■■■ Government officials may raise qualified immunity as an affirmative defense to actions brought against them under 42 U.S.C. § 1983. *See Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 1923–24, 64 L.Ed.2d 572 (1980). In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. *Harlow* thus announced an objective standard for determining whether a government officer is entitled to qualified immunity. *See Id.* at 816–19, 102

---

**13.** Although the court has ruled that Lucas and Bennett in their official capacities are entitled to immunity under Mississippi law for the wrongful death claim, conduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 cannot be immunized by state law. *See McLaughlin v. Tilendis,* 398 F.2d 287, 290

(7th Cir.1968). Therefore, the Defendants' qualified immunity defense to the Plaintiff's section 1983 claim raises a question of federal law which the court must consider separately. *See Hampton v. Chicago,* 484 F.2d 602, 607 (7th Cir.1973), *cert. denied,* 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974).

S.Ct. at 2737–39. Under this objective test, a court must determine whether a reasonable official could have believed his or her conduct was unlawful "in light of clearly established law and the information [the officer] possessed" at the time. *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3039–40, 97 L.Ed.2d 523 (1987). *See also Frazell v. Flanigan,* 102 F.3d 877, 886 (7th Cir.1996). This doctrine gives "public officials the benefit of legal doubts by relieving them from having to decide at their financial peril, how judges will decide future cases." *Kernats v. O'Sullivan,* 35 F.3d 1171, 1176 (7th Cir.1994) (internal citation omitted).

In the Seventh Circuit, courts use a two-step approach for analyzing a defendant's qualified immunity defense: "(1) Does the alleged conduct set out a constitutional violation? and (2) Were the constitutional standards clearly established at the time in question?" *Kernats v. O'Sullivan,* 35 F.3d 1171, 1176 (7th Cir.1994) (citing *Siegert v. Gilley,* 500 U.S. 226, 231–32, 111 S.Ct. 1789, 1792–93, 114 L.Ed.2d 277 (1991)). A negative answer to either prong of this test will decide the matter. *See Montville v. Lewis,* 87 F.3d 900, 902 (7th Cir.1996), *cert. denied,* — U.S. ——, 117 S.Ct. 961, 136 L.Ed.2d 847 (1997). Qualified immunity is generally a question of law for the court to resolve. *See Rakovich v. Wade,* 850 F.2d 1180, 1201–02 (7th Cir.) (en banc), *cert. denied,* 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988).

Once a defendant has raised a qualified immunity defense, the plaintiff bears the burden of demonstrating the violation of a clearly established right. *See Kernats,* 35 F.3d at 1176 (citing *Rakovich,* 850 F.2d at 1209). To demonstrate that a right is clearly established, a plaintiff need not show that the very act in question was previously held unlawful, *see Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987), or that a prior case is "on all fours" with the facts and the law in his own case, *see Landstrom v. Illinois Department of Children & Family Services,* 892 F.2d 670, 676 (7th Cir.1990). Instead, "[c]losely analogous cases, those decided before the defendants acted or failed to act, are

required to find that a constitutional right is clearly established." *Rakovich,* 850 F.2d at 1209 (quoting *Powers v. Lightner,* 820 F.2d 818, 821 (7th Cir.1987), *cert. denied,* 484 U.S. 1078, 108 S.Ct. 1057, 98 L.Ed.2d 1019 (1988)).

A key determination in this analysis is the level of generality for courts to apply in identifying which legal rights are clearly established. See *Kerr v. Farrey,* 95 F.3d 472, 480 (7th Cir.1996). "[T]he Supreme Court cautioned against imposing an unrealistic burden on public officials" in conducting this analysis. *Id.* (citing *Anderson,* 483 U.S. at 639, 107 S.Ct. at 3038–39). Requiring too much hesitation from our public officials would impair the purpose of qualified immunity which is to give "ample room for mistaken judgments" by protecting " 'all but the plainly incompetent or those who knowingly violate the law.' " *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (quoting *Malley v. Briggs,* 475 U.S. 335, 343, 341, 106 S.Ct. 1092, 1097, 1096, 89 L.Ed.2d 271 (1986)). A "clearly established" right must be sufficiently clear so that a reasonable official would understand that he is violating that right. *See Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039.

As a threshold matter, the Plaintiff argues that the Defendants are not entitled to qualified immunity because the acts of which he complains were nonfeasance of "ministerial" rather than "discretionary" duties. For the reasons explained in Part I, Section B, above, and because this court believes that the characterization of acts as "ministerial" or "discretionary" is governed by the same principles under federal law as govern under Mississippi law, the court rejects this argument. *See Adden v. Middlebrooks,* 688 F.2d 1147, 1152 (7th Cir.1982).

In this case, the dispositive issue with regard to qualified immunity is whether the Plaintiff has alleged a cognizable section 1983 claim at all. Hodgson maintains that the state officials caused his daughter's death in violation of the right to life which is secured by the Fourteenth Amendment. In order to prevail on this theory, the Plaintiff would have to prove that John Bracey Smith requested a transfer to Wisconsin and that

Lucas and Bennett intentionally failed to warn, or to supervise, or to comply with the Uniform Act for Out-of-State Parolee Supervision and that this failure to act caused the death of Monique Hodgson. There is no liability for negligence under section 1983. *See Jones v. City of Chicago,* 856 F.2d 985, 992 (7th Cir.1988).

Even if Hodgson could prove these allegations of nonfeasance and the requisite state of mind of the Defendants, the question is whether this conduct violated the Fourteenth Amendment rights of himself and his daughter. The Fourteenth Amendment protects only from deprivations by the "State ... of life ... without due process of law." U.S. Const. amend XIV. It was John Bracey Smith, not Lucas and Bennett, who killed Monique Hodgson. Smith killed Hodgson's daughter some time after leaving Mississippi. He was at no time an agent of the Mississippi corrections officials, so his actions cannot be fairly attributed as "state action." Under law clearly established by the United States Supreme Court at the time Monique Hodgson's death took place in August of 1992, Lucas and Bennett could not be held liable under section 1983 for the acts of Smith. Their acts or nonacts were too remote to be causal of the death. *See Martinez v. California,* 444 U.S. 277, 284–85, 100 S.Ct. 553, 558–59, 62 L.Ed.2d 481 (1980) (parole board not liable under Fourteenth Amendment for murder committed by parolee they released).

▮ Prior to Monique Hodgson's death in 1992, the Seventh Circuit had addressed the related issue of whether corrections officials can be held liable to members of the general public for the acts of convicted persons under their supervision. In *Walker v. Rowe,* 791 F.2d 507 (7th Cir.), *cert. denied,* 479 U.S. 994, 107 S.Ct. 597, 93 L.Ed.2d 597 (1986), the court of appeals reversed a jury verdict awarding damages to the survivors of Illinois prison guards who had been killed or injured by rioting inmates. The court ruled that corrections officials could not be held liable for violating the Fourteenth Amendment rights of the guards because:

> The constitution requires the state to grant "process" before it deprives people of life, liberty, or property. It is a con-

straint on the state's power to act, a prohibition on the misuse of official power. *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. [662], 665–66, 88 L.Ed.2d 662 [(1986)]. It does not require the state to guarantee life, liberty, or property against invasion by private actors; it requires only that the state not act, unless with due process, when life, liberty, or property are in the balance.

> "Due process" does not mean "due care." *Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1980).

*Walker v. Rowe,* 791 F.2d at 509–10. The court went on to explain that "because the bill of rights is a charter of negative liberties, the state need not protect people from danger." *Id.* at 510. The state "has no constitutional duty to keep aggressive people out of free society." *Id.* (citing *Bowers v. DeVito,* 686 F.2d 616 (7th Cir.1982)). The "bill of rights is designed to protect people from the state, not to ensure that the state supplies minimum levels of safety or comfort." *Walker v. Rowe,* 791 F.2d at 510.

▮ Courts have found that the Due Process Clause imposes a duty on state actors to protect or care for citizens only in two situations: first, in custodial and other settings in which the state has limited the individual's ability to care for himself; and second, when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced. *See Gregory v. City of Rogers,* 974 F.2d 1006, 1010 (8th Cir.1992) (en banc), *cert. denied,* 507 U.S. 913, 113 S.Ct. 1265, 122 L.Ed.2d 661 (1993).

In *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 197, 109 S.Ct. 998, 1004, 103 L.Ed.2d 249 (1989), the Supreme Court held that liability can arise where there is a "special relationship" between the state and the victim. This special relationship is found only in certain limited circumstances such as where the state takes a person into custody and holds him there against his will. *See Id.* The Court explained that:

> in the substantive due process analysis, it is the State's affirmative act of restraining

the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

*Id,* at 200, 109 S.Ct. at 1006.

In this case, the special relationship required by *DeShaney* did not exist between Monique Hodgson and the Mississippi corrections officers. No custodial relationship existed and the State of Mississippi had not affirmatively restrained her freedom to act on her own behalf. Therefore, this first exception does not apply.

In *DeShaney,* the Supreme Court left open the possibility that a constitutional violation might occur if the state creates a danger that deprives an individual of Fourteenth Amendment rights, This "state created danger" theory of liability has four elements: (1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the state and the plaintiff; (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur. *See Mark v. Borough of Hatboro,* 51 F.3d 1137, 1152 (3d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 165, 133 L.Ed.2d 107 (1995). While most circuits did not recognize this theory of liability until after August of 1992,[14] the Seventh Circuit accepted the "state created danger" theory prior to Monique Hodgson's death. *See, e.g., Losinski v. County of Trempealeau,* 946 F.2d 544 (7th Cir.1991); *Ross v. United States,* 910 F.2d 1422 (7th Cir.1990); *White v. Rochford,* 592 F.2d 381 (7th Cir.1979).

It is doubtful that Hodgson could prove any of the elements necessary to recover under this theory. His pleadings and affidavits show no prior relationship between the Mississippi Defendants and his daughter. The relationship requirement for the state-created danger theory contemplates some contact such that the Plaintiff's decedent would have been a foreseeable victim of the Defendants' failure to act. See *Kneipp v. Tedder,* 95 F.3d 1199, 1200 n. 22 (3d Cir. 1996). There is no allegation that the Defendants were aware that Monique Hodgson, as distinguished from the public at large, faced any special danger. Therefore, this second exception does not apply.

Having undertaken this review of the law as it existed at the time of Monique Hodgson's death, the court concludes that Hodgson has not alleged conduct that sets out a constitutional violation. The Plaintiff has not met his burden of showing that the Defendants violated constitutional standards that were clearly established at the time in question. Consequently, because no cognizable section 1983 claim has been presented in this case, Defendants Lucas and Bennett are entitled to qualified immunity from suit.

In affirming the dismissal of a wrongful death claim brought pursuant to section 1983 against physicians at a state mental hospital who had discharged a decedent's assailant, Judge Posner explained the legal underpinnings of this result as follows:

> There is a constitutional right not to be murdered by a state officer, for the state violates the Fourteenth Amendment when its officer, acting under color of state law, deprives a person of life without due process of law. *Brazier v. Cherry,* 293 F.2d 401, 404–05 (5th Cir.1961). But there is no constitutional right to be protected by the state against being murdered by criminals or madmen.
>
> It is monstrous if the state fails to protect its residents against such predators, but it does not violate the due process clause of the Fourteenth Amendment. . . .

*Bowers v. DeVito,* 686 F.2d at 618. Because the Hodgsons had no federal constitutional right to be protected by the state from the acts of John Bracey Smith, the Plaintiff's claims under section 1983 must fail.

---

14. *See, e.g., Kneipp v. Tedder,* 95 F.3d 1199 (3d Cir.1996); *Uhlrig v. Harder,* 64 F.3d 567 (10th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 924, 133 L.Ed.2d 853 (1996); *Dwares v. City of New York,* 985 F.2d 94 (2d Cir.1993).

### III. *PERSONAL JURISDICTION*

As another ground for dismissal, Defendants Lucas and Bennett urge the court to rule that it lacks personal jurisdiction over them. *See* Federal Rule of Civil Procedure 12(b)(2). The Defendants, both citizens of Mississippi, argue that they are not amenable to service of process under the Wisconsin long-arm statute, Wis. Stat. § 801.05, and that asserting personal jurisdiction over them would offend the Due Process Clause because they do not have any legally significant contacts with Wisconsin and had no expectation of being summoned to answer for damages in a court in Wisconsin.

 The Plaintiff has stated that the claims against the individuals in their personal capacities are federal question or civil rights claims brought pursuant to 42 U.S.C. § 1983. Subject matter jurisdiction over these claims is authorized by 28 U.S.C. §§ 1331 & 1337. When determining whether the court has personal jurisdiction over a defendant in a federal question case, the court must conduct a two-pronged inquiry by asking: (1) whether the court has the power to exercise jurisdiction under the forum state's long-arm statute, and (2) whether haling the defendants into court accords with the principles of the Due Process Clause. *See United States v. Martinez De Ortiz*, 910 F.2d 376, 381 (7th Cir.1990); *Boston Chicken, Inc., v. Market Bar–B–Que, Inc.*, 922 F.Supp. 96, 97 (N.D.Ill.1996). The Plaintiff has the burden of establishing a prima facie case of personal jurisdiction. The allegations of his Complaint are taken as true, unless controverted by the Defendants' affidavits, but any conflicts and inferences are resolved

in the Plaintiff's favor. *See Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir.1987)

 When a Plaintiff is asserting a nondiversity claim and no applicable federal statute provides its own means of obtaining personal jurisdiction, Defendants must be served pursuant to the forum state's long-arm statute. *See Omni Capital International v. Rudolf Wolff & Company*, 484 U.S. 97, 104–08, 108 S.Ct. 404, 409–12, 98 L.Ed.2d 415 (1987). In this case, none of the federal constitutional provisions or statutes cited by the Plaintiff as the basis for his claims provides its own means of service.[15] Therefore, service and personal jurisdiction must comply with Federal Rule of Civil Procedure 4(e)[16] which allows for service "under the circumstances" provided in the long-arm statute of the forum state.

 Defendants Lucas and Bennett have carefully analyzed each subsection of Wisconsin's long-arm statute, Wis. Stat. § 801.05, and have established that nothing in that statute authorizes this court's exercise of personal jurisdiction over them in this situation. The Plaintiff, in response, contends that the Defendants are subject to personal jurisdiction under subsection 801.05(1)(d) of the Wisconsin long-arm statute which provides that Wisconsin courts have personal jurisdiction in any action arising "within or without this state, against a Defendant who, when the action is commenced .... is engaged in substantial and not isolated activities within this state, whether such activities are wholly interstate, intrastate, or otherwise." In support of his argument, the Plaintiff has submitted the

---

**15.** Section 1983 of Title 42 of the United States Code does not authorize nationwide service of process. *See Catrone v. Ogden*, 647 F.Supp. 850, 856 (D.Mass.1986); *Safeguard Mutual Insurance Company v. Maxwell*, 53 F.R.D. 116, 118 (E.D.Pa. 1971).

**16.** Federal Rule of Civil Procedure 4(e) provides that:

(e) **Service Upon Individuals Within a Judicial District of the United States.** Unless otherwise provided by federal law, service upon an individual from whom a waiver has not ben obtained and filed, other than an infant or an incompetent person, may be effected in any judicial district of the United States:

(1) pursuant to the law of the state in which the district court is located, or in which service is effected, for the service of a summons upon the defendant in an action brought in the courts of general jurisdiction of the State; or

(2) by delivering a copy of the summons and of the complaint to the individual personally or by leaving copies thereof at the individual's dwelling house or usual place of abode with some person of suitable age and discretion then residing therein or by delivering a copy of the summons and of the complaint to an agent authorized by appointment or by law to receive service of process.

Affidavit of William Ridgely who is the Interstate Compact Administrator for the State of Wisconsin. Ridgely states that a review of his active files reveals that his office received twenty-one requests for transfers of parolees from Mississippi to Wisconsin pursuant to the Uniform Act for Out–of–State Parolee Supervision and made forty-one requests for transfers from Wisconsin to Mississippi. *See* Brief Opposing Revised and Comprehensive Motion to Dismiss at Exhibit A (Affidavit of William Ridgely at ¶¶ 6 & 7).

The Plaintiff has presented nothing to show that Defendants Lucas or Bennett personally handled any of the twenty-one requests to transfer prisoners from Mississippi to Wisconsin. Even if they had, these requests cannot be characterized as acts by which the Defendants purposefully availed themselves of the privilege of conducting activities within Wisconsin or acts which should have reasonably led them to anticipate being haled into court here. *See World–Wide Volkswagen Corporation v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980); *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958). Based on this showing, the court concludes that the Plaintiff's attempt to establish minimum contacts between Lucas, Bennett and Wisconsin is inadequate and that personal jurisdiction over Lucas and Bennett is not available under subsection 801.05(1)(d). *See Adden v. Middlebrooks*, 688 F.2d 1147, 1156 (7th Cir.1982) (concluding that the federal court in Illinois did not have personal jurisdiction over Louisiana's Director of Department of Corrections or the Superintendent of Louisiana Correctional and Industrial School who were sued for a wrongful death committed in Illinois by two escaped prisoners from Louisiana). *See also Wag–Aero, Inc. v. United States*, 837 F.Supp. 1479, 1484–87 (E.D.Wis.1993), *aff'd*, 35 F.3d 569 (7th Cir.1994).

■ Next, the Plaintiff argues that personal jurisdiction can be obtained under sub-

section 801.05(3) of Wisconsin's long-arm statute, which provides that Wisconsin can exercise personal jurisdiction "[i]n any action claiming injury to person or property within or without this state arising out of an act or omission within this state by the Defendant." Hodgson contends that the Defendants' failure to warn Wisconsin authorities about John Bracey Smith caused his loss and that this omission occurred in Wisconsin. However, he has failed to cite any legal authority for his strained interpretation of this subsection. Any failure to warn or to comply with the Uniform Act for Out–of–State Parolee Supervision on the part of Lucas and Bennett would have occurred in Mississippi, so subsection 801.05(3) does not authorize personal jurisdiction over them. *See Lincoln v. Seawright*, 104 Wis.2d 4, 13, 310 N.W.2d 596, 600–01 (1981) (failure to warn about vicious dog shipped to Wisconsin occurred in sending state).

■ Under the second prong of the test for personal jurisdiction, the Plaintiff must establish that the exercise of personal jurisdiction-by this court would not offend the Due Process Clause of the Fifth Amendment.[17] Federal courts are divided over whether the "minimum contacts" required under the Fifth Amendment are contacts with the United States in general or contacts with the forum state only. *Compare DeMelo v. Toche Marine, Inc.*, 711 F.2d 1260, 1264–69 (5th Cir.1983) (holding majority opinion that minimum contacts with forum state are required) *with Handley v. Indiana & Michigan Electric Company*, 732 F.2d 1265, 1269 (6th Cir.1984) (espousing minority position that contacts need only be with United States in federal question case).

The Seventh Circuit has not directly addressed this issue. However, in *United Rope Distributors, Inc. v. Seatriumph Marine Corporation*, 930 F.2d 532 (7th Cir.1991), Judge Easterbrook indicated that the Seventh Circuit favors the minority view that a federal court's concern should be whether a defendant has sufficient national contacts

---

**17.** When jurisdiction over a claim in federal court is based upon federal question jurisdiction, the Due Process Clause of the Fifth Amendment rather than the Due Process Clause of the Four-

teenth Amendment is the focus of analysis. *See Brunswick Corporation v. Suzuki Motor Company*, 575 F.Supp. 1412, 1416 n. 2 (E.D.Wis.1983).

such that the exercise of jurisdiction by the nation's courts under the nation's laws does not offend traditional notions of fair play and substantial justice. *See Id.* at 536. *See also Hayeland v. Jaques,* 847 F.Supp. 630, 632–34 (E.D.Wis.1994).

It is clear that Lucas and Bennett have sufficient contacts with the United States. Therefore, they would meet the Fifth Amendment minimum contacts criteria of the minority view. However, as discussed above, they do not have sufficient systematic and continuous contacts with Wisconsin, so exercising personal jurisdiction over them would not comport with the Fifth Amendment under the majority view.

In either case, the Plaintiff has not met his burden of establishing that personal jurisdiction is authorized under the Wisconsin long-arm statute. Consequently, the claims against Lucas and Bennett in their personal capacities are also dismissed for lack of personal jurisdiction. *See* Federal Rule of Civil Procedure 12(b)(2).

### *ORDER*

For these reasons, the court ORDERS that the "Defendants' Motion to Dismiss Plaintiff's Third Amended Complaint" (filed November 13, 1995) IS GRANTED for lack of jurisdiction and because the Defendants are immune from suit. *See* Federal Rule of Civil Procedure 12(b).

IT IS FURTHER ORDERED that, pursuant to Federal Rule of Civil Procedure 58, the Clerk of Court shall enter a final order of dismissal as a separate document. This Order shall provide that:

This action came on for hearing before the court, the Honorable Thomas J. Curran, District Judge, presiding, and the issues having been heard and a decision having been rendered,

IT IS ORDERED

that this action brought by Plaintiff Albert Hodgson against Defendant Mississippi Department of Corrections and Defendants Eddie Lucas and Jo Bennett in their

individual and official capacities is dismissed with prejudice.