Aaron David WEINBERGER, as administrator of the Estate of Jeremiah Benjamin Weinberger; Aaron David Weinberger, as father of Jeremiah Benjamin Weinberger, Plaintiff,

v.

The STATE OF WISCONSIN, Probation Officer Donna Chester and as yet unnamed probation officers and employees, Defendants.

No. 94–C–0574–C.

United States District Court, W.D. Wisconsin.

Sept. 28, 1995.

Frederick F. Cohn, Frederick F. Cohn, Ltd., Chicago, IL, for Aaron David Weinberger.

Michael J. Losse, Assistant Attorney General, Madison, WI, for Donna Chester.

## OPINION AND ORDER

CRABB, Chief Judge.

This is a civil case brought pursuant to 42 U.S.C. § 1983, 1985 and 1986 and Wisconsin state law in which plaintiff Aaron David Weinberger is suing as administrator of his son's estate and as the father of one of the victims of Jeffrey Dahmer's horrific crimes. Plaintiff contends that defendants acted unreasonably, in a grossly negligent manner and with reckless disregard for the safety of persons in the class of Dahmer's abuse victims by mismanaging Dahmer's supervision. Specifically, plaintiff alleges that defendant Donna Chester failed to visit Dahmer's residence as she was required to do while he was on probation, failed to act on indications that Dahmer was about to have a nervous breakdown and would engage in abuse again, and failed to make any attempts to obtain counseling for Dahmer. Plaintiff alleges that defendant did not want to visit Dahmer at his apartment because he lived in a racially-mixed neighborhood and that as a direct

result of defendant Chester's failure to make such visits, Dahmer was encouraged to commit murders in his apartment because he had no reason to fear he would be visited there by his probation officer. Plaintiff is seeking in excess of $50,000 from the state of Wisconsin and its employees, particularly defendant Chester and her yet unnamed supervisors.

Defendants have moved for summary judgment, contending that any action against the state and its employees in their official capacities is barred by the Eleventh Amendment, that the action against the yet unnamed defendants is barred by plaintiff's failure to identify them in a timely fashion, that the complaint fails to state a cause of action against defendant Chester in her individual capacity and that, if it does state a claim, she is entitled to qualified immunity, that the state law causes of action are barred by plaintiff's failure to plead the filing of a timely notice of claim pursuant to Wis.Stat. § 893.82 and by sovereign immunity and that the doctrines of res judicata and collateral estoppel bar the prosecution of the federal claims asserted in the complaint. Defendants argue also that plaintiff should be held to a heightened standard of pleading if the doctrine of qualified immunity is to have any meaning although they do not explain what relevance such an argument has to a motion for summary judgment. I consider it irrelevant and have not addressed it.

I conclude that judgment must be granted to defendants because the state is immune from suit, because plaintiff has never identified the "as yet unnamed probation officers and employees," because the undisputed facts show that plaintiff has no constitutional claim against defendant Chester and because plaintiff's state law claims are barred by his failure to plead the filing of a timely notice of claim as well as by the state's doctrine of official immunity. It is unnecessary to reach defendants' arguments regarding qualified immunity under federal law, collateral estoppel or res judicata.

From the findings of fact proposed by the parties, I find that there is no genuine issue with respect to the following material facts.

## UNDISPUTED FACTS

Plaintiff is the father of Jeremiah Benjamin Weinberger and the administrator of his estate. Jeremiah was murdered by Jeffrey Dahmer on or about July 6, 1991. More than two years earlier, on May 24, 1989, Dahmer had been convicted of second degree sexual assault and enticing a child for immoral purposes, both with a thirteen year old boy, and had been sentenced to one year in the Milwaukee House of Correction and five years' probation.

Defendant Donna Chester was Dahmer's probation officer from on or about March 9, 1990 until on or about July 23, 1991. A graduate of the University of Wisconsin–Milwaukee School of Social Welfare with a major in criminal justice, she became a state probation and parole agent on January 9, 1990, and was assigned to the Milwaukee Sex Offender Unit on February 25, 1990. In March 1990, after her training, she took over the entire 121 active cases of a departing agent. All of the clients assigned to her were sex offenders, of whom about two-thirds to three-fourths were considered to be high-risk and at maximum supervision levels. (As a general rule, sex offenders are considered to be of higher risk than other types of offenders.) In addition, defendant had approximately twenty-five "institution cases" (institutionalized clients in "preparole" status) that required substantial amounts of her time and considerable paperwork.

Defendant saw Dahmer approximately twice a month, helped him to enroll in an outpatient alcohol treatment program at the DePaul Rehabilitation Hospital, made multiple attempts to refer him for counseling to the department's clinical services program, where he was eventually in treatment with a psychiatrist, referred him to the Milwaukee Mental Health Complex and to various money management agencies, monitored his progress in these programs and helped him to take responsibility for making corrections in his own life. During the appointments, defendant discussed Dahmer's concerns or issues she thought needed addressing. The appointments lasted from ten minutes to an hour, with most of them being more than half an hour.

One of defendant's priorities was getting Dahmer into alcohol abuse treatment because the court had ordered such treatment as a condition of probation. Dahmer blamed his problems on alcohol and Dahmer's father had emphasized the importance of addressing Dahmer's alcohol abuse. Defendant obtained Dahmer's admission to an intensive out-patient alcohol abuse program at DePaul Rehabilitation Hospital that lasted from May 22 through November 15, 1990. She had no reason to believe, either from his file or from her own contacts with him, that Dahmer had a drug abuse problem. Dahmer met with his DePaul counselor one to three times a week as he progressed through the program. He had access to a psychiatrist and a psychologist through DePaul upon referral by his counselor. Defendant had regular contact with Dahmer's counselor, who reported that Dahmer was fully cooperative and seemed to be making progress. She received no indication from the staff at DePaul that Dahmer seemed dangerous or that he was relapsing into criminal activity. She learned from the staff on November 15, 1990, that Dahmer had completed the program successfully.

On about August 13, 1990, defendant became concerned that Dahmer was depressed. She discussed a referral to the Clinical Services Unit of the Department of Corrections with the unit psychologist, Joan Kojis, who informed her that since Dahmer was employed, had insurance and was already in treatment at DePaul, he should be referred to the clinician there. Sometime later, Dahmer's counselor at DePaul called defendant, recommended that Dahmer see a psychiatrist for depression and set up an appointment for Dahmer with a doctor at DePaul.

On or about August 27, 1990, defendant referred Dahmer to the Milwaukee County Mental Health Complex for evaluation and treatment. She called to arrange for an assessment and was told Dahmer would have to come in and could not make an appointment. On September 4, defendant instructed Dahmer to go to the mental health complex.

The only problem DePaul staff reported to defendant was that one of Dahmer's thrice weekly urine tests came back positive for Valium on September 10, 1990. Defendant ordered him to appear in her office. He claimed the drug was residual medication from prior treatment; a second urinalysis was performed and the result was negative. Defendant warned Dahmer to stop taking any medication unless he had a current prescription, to go to the Milwaukee County Mental Health Complex for an evaluation and to bring in verification. On October 8, 1990, Dahmer went in for an evaluation. He informed defendant he did not have the $200 required for the assessment and that he would be expected to pay for treatment thereafter. Defendant discussed treatment for Dahmer with the department's Clinical Services Unit because his depression seemed worse. The psychologist in the unit said again that it would be more appropriate for Dahmer to be referred to a DePaul clinician since he was in treatment there.

On about October 23, 1990, defendant learned that Dahmer had seen a psychiatrist at the DePaul facility. No one on the DePaul staff advised defendant that Dahmer was dangerous, that his level of supervision should be increased or that she should do anything in addition to what she was doing already. Dahmer told her that the doctor had prescribed anti-depressant medication but he could not afford it. This prompted a counseling session in which defendant told Dahmer that he must change his negative behavior and attitude about money, prioritize his needs and spend money on necessities rather than on the things he wanted.

Dahmer was employed at the Ambrosia Chocolate Company during most of the time he was on probation. He rarely missed appointments with defendant or with the people to whom he was referred. He was compliant with the goals and objectives of probation supervision and was one of the most cooperative clients defendant worked with.

Dahmer denied consistently that he drank alcohol and his urine tests at DePaul were always negative for alcohol. He told defendant he attended Alcoholics Anonymous meetings occasionally. At a meeting on November 5, 1990, Dahmer discussed bankruptcy with defendant as a means of dealing with his debts. He told her he would be able to

get cheaper anti-depressant medication from his DePaul therapist.

After Dahmer's completion of the course of treatment at DePaul on November 15, 1990, he told defendant he would continue to see the psychiatrist there regarding depression and sexual issues and that he was taking the prescribed medication. This was confirmed by DePaul staff on December 4, 1990. They noted that Dahmer was one of their most cooperative clients and that he had missed only one appointment. In February 1991, Dahmer missed an appointment with defendant for the first time. He called to apologize and came in voluntarily a week before his next scheduled appointment. He reported that he was managing to obtain his medication and that he was not drinking. Defendant referred him to a support group for gay men at the Counseling Center. In March, defendant contacted the counseling center in an effort to enroll Dahmer in sex offender treatment. The center declined to accept Dahmer because his crime did not fit the typical scenario of child molestation. In light of this rejection and the fact that Dahmer's treatment at DePaul had stopped, defendant tried again in May 1991 to obtain clinical services for Dahmer from the department's Clinical Services Unit. Dahmer was given an appointment for June 11 with Dr. Crowley, consulting psychiatrist for the department. Dr. Crowley found no serious mental disorder and only mild depression and gave Dahmer a voucher for psychiatric medication. He said nothing in his report to indicate potential dangerousness and made no suggestions for defendant.

On June 24, 1991, Crowley saw Dahmer again. Dahmer reported no significant problems, either with depression or otherwise, and made an appointment to see Crowley on June 27. Dahmer met with defendant on July 8 (two days after he had murdered Jeremiah Weinberger) and reported he was making progress with Dr. Crowley, that he was concerned he would be fired for missing work and for being late and that he was contemplating committing suicide if he lost his job. Defendant did not believe Dahmer was suicidal; in fact, he seemed to her to be fully functional. She concluded she had no legal grounds on which to seek civil commitment. She counseled Dahmer on his employment problems, knowing he had an appointment with Crowley two days later.

During his sessions with Dahmer, which continued until July 18 (four days before Dahmer was arrested), Crowley saw no evidence of dangerousness and never recommended to defendant that she provide closer supervision or take any other steps in addition to those she was already taking.

Defendant never had grounds to take disciplinary action against Dahmer or to incarcerate him. Given Dahmer's compliance with supervision, his follow up on referrals, his steady employment, his involvement in treatment, the lack of any reports of violent or illegal behavior or of police contacts and the absence of any warnings of problems from any of the experts treating him, defendant Chester had no reason to believe he required close supervision. She submitted four requests for waivers of home visits, citing workload adjustment as the reason. These requests were approved by her supervisor, James Wake, on May 1, 1990, June 1, 1990, November 29, 1990 and June 17, 1991. Defendant never made any visits to Dahmer's residence. All of her contacts with him took place in her office or over the telephone.

Jeffrey Dahmer's modus operandi was to lure his victims to his apartment, where he drugged and then killed them in the course of or before performing sexual acts. He dismembered his victims and preserved some of the body parts such as skulls or, in some cases, entire skeletons. He took elaborate steps to prevent discovery of his crimes, as evidenced by the techniques he developed for disposing of bodies and decreasing odors, his locking the cosmetic case in which he kept one skull and his painting other skulls so that they would appear to be artificial.

Plaintiff filed a notice of claim with the Attorney General for the State of Wisconsin on October 31, 1991, 117 days after the death of his son. The notice alleged that the death was the direct result of the negligent failure to control and supervise the probation of Jeffrey Dahmer by the Wisconsin Department of Health and Social Services. It did

not name any individual employee of the department.

## OPINION

■ Understandably, plaintiff is searching for explanations for the death of his son, although it is unlikely there are any rational ones. His response to the unimaginable evil that Jeffrey Dahmer represents is to search for someone else to blame, some entity or person whose actions can be gauged in logical terms. He has chosen the state of Wisconsin and Dahmer's probation officer, attempting to characterize their actions and omissions in federal constitutional terms. His attempt cannot breach the basic framework of the Constitution, which is designed in large part as a limitation on the state's power to act, rather than as "a guarantee of certain minimal levels of safety and security." *DeShaney v. Winnebago County Social Services Dep't,* 489 U.S. 189, 195, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989). The due process clause of the Fourteenth Amendment "forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *Id.*

■ At the outset, it is necessary to grant defendants summary judgment on plaintiff's assertions of liability against the state and against defendant Chester in her official capacity. Under the Eleventh Amendment, a state cannot be sued in federal court unless it has consented to suit or Congress has made an explicit abrogation of immunity. *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 98, 99, 104 S.Ct. 900, 906, 907, 79 L.Ed.2d 67 (1984). Neither exception is applicable in this case. The state has not given its consent to suit and Congress has never abrogated the states' immunity to suit under the civil rights statutes. To the extent that plaintiff is suing defendant Chester other than as an individual, the Eleventh Amendment bar prevents this suit as well because "a judgment against a public official 'in his official capacity' imposes liability on the entity that he represents...." *Brandon v. Holt,* 469 U.S. 464,

471, 105 S.Ct. 873, 878, 83 L.Ed.2d 878 (1985). Defendant Chester may be sued in her individual capacity because the states' immunity from federal suit does not extend to their employees sued in their individual capacities for their violations of state and federal law.

■ Plaintiff argues that defendants should not be permitted to assert Eleventh Amendment immunity because they removed this case from state court where the Eleventh Amendment would not have prevented the prosecution of plaintiff's claim. It is true that the Eleventh Amendment is a bar to federal jurisdiction, *Pennhurst State School,* 465 U.S. at 98, 104 S.Ct. at 906, and has no operative effect in the state courts, but plaintiff's state court suit against the state and against its employees in their official capacities would have gone aground for other reasons. In state court, the principle of sovereign immunity protects the state from being sued without its consent. Moreover, neither the state nor its officials acting in their official capacities can be sued under § 1983 in any court, state or federal, because they are not "persons" under § 1983. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989). Therefore, even if defendants had not removed this case, plaintiff could not have proceeded against the state or against defendant Chester in her official capacity under § 1983.

■ Plaintiff has alleged violations of §§ 1985 and 1986 in addition to § 1983 but he has alleged no facts to support his invocation of these statutes. He has neither alleged that a federal officer has been prevented from carrying out his or her duties, § 1985(1), nor alleged a conspiracy to deter any party or witness from attending or testifying in federal court proceedings or conspiring to influence a jury's verdict, § 1985(2) (first clause). He has alleged no facts to support an allegation of a conspiracy to hinder the due course of justice in state courts with an intent to deny equal protection of the law or a conspiracy to deprive any person or class of persons of equal protection of the laws, § 1985(2) (second clause) and (3). Although he has made conclusory statements to the effect that defendant Chester acted with

animus or recklessness toward a class of young male homosexuals, these allegations are insufficient to put any material fact into dispute. Plaintiff has no claim under § 1986 unless he has a claim under § 1985, as § 1986 is derivative of § 1985 liability. *Rodgers v. Lincoln Towing Service, Inc.*, 771 F.2d 194, 203 (7th Cir.1985).

■■■ Plaintiff filed his complaint naming unidentified state probation officers and employees in August 1994. In September, a scheduling order was established, giving plaintiff until November 18, 1994, in which to amend his pleadings. Thereafter, he took no action until February 15, 1995, when he moved for an extension of time in which to respond to defendant's motion for summary judgment. On March 31, plaintiff moved for permission to add two defendants. The motion was denied on the ground that plaintiff had suggested no reason why he could not have filed the same motion within the time allowed for amendment of the pleadings. Plaintiff renewed the motion in May after he had obtained counsel and it was denied again on the dual grounds that he had not shown adequate reasons for his failure to file a timely motion to amend and he was still unable to identify the persons he would add if permission to amend were granted.

The filing of a lawsuit entails obligations upon the filer who has by his act embroiled others in litigation involuntarily and engaged the limited public resources of the court. Primary among those obligations is the commitment of time and resources to the diligent prosecution of the case. Plaintiff has not made that commitment. As his affidavit shows, he has put other concerns ahead of this litigation. It may be that in the scheme of things he has made the right choices for himself and his family, but the fact is that his choices have not advanced this litigation and he must bear the consequences of them. His suit against the "as yet unnamed probation officers and employees" will be dismissed for his failure to identify them expeditiously.

■■■ The important question to be determined is whether plaintiff has succeeded in showing that genuine issues of fact require a trial of his claims against defendant Donna Chester. He has dropped the allegation made in his complaint that defendant failed to take any steps to obtain counseling for Dahmer, presumably in light of the undisputed facts to the contrary. He argues instead that defendant's recklessness in accepting an unreasonably heavy caseload, her failure to make a home visit and her failure to recognize that Dahmer's mental condition was worsening denied his son and himself due process. Presumably he is contending that defendant's recklessly inadequate supervision of Dahmer subjected plaintiff's son to the deprivation of his life without due process of law. Such a contention cannot succeed. Plaintiff's son was not murdered by defendant but by a third person who was not acting on behalf of the state. *See Martinez v. California*, 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980) (Fourteenth Amendment protects persons from deprivation of life by the *state* without due process of law, not from the actions of third parties). The Constitution does not create a duty to protect public safety against invasion by private actors. *DeShaney*, 489 U.S. at 195, 109 S.Ct. at 1003. State actors can be liable only if they create the dangerous situation or render the victims more vulnerable to harm. *Id.* at 201, 109 S.Ct. at 1006; *Reed v. Gardner*, 986 F.2d 1122, 1125 (7th Cir.1993).

■■■ Plaintiff maintains that defendant's failure to make home visits to Dahmer's apartment was an omission by the state that caused the death of his son: the murder would not have occurred had Dahmer not had the privacy of his apartment in which to commit it, knowing that he was safe from any visits there by his probation officer. Not only is the premise for the argument questionable, but plaintiff has shown neither that Dahmer knew his probation officer would not visit him at his apartment nor that her visits would have been unannounced and thorough, two elements that would be critical in deterring Dahmer from using his apartment for committing murders and storing the remains. Even if it is true that plaintiff's son would not have been murdered *but for* defendant's failure to visit Dahmer's apartment unexpectedly, her failure is not a cause that has legal significance. *See United States v. Feliciano*, 45 F.3d 1070, 1074 (7th Cir.1995) ("A 'but for'

cause is only one kind of cause, ... in fact it often is not deemed a cause at all.") Plaintiff must prove a different kind of cause in order to recover from defendant. He must prove that the supervision of Dahmer created or increased the harm to Dahmer's victims or somehow made them more vulnerable. In fact, the victims were in no worse position than if the state had never taken on Dahmer's supervision. They had not been taken into custody or otherwise limited in their ability to care for themselves and they had not been placed affirmatively into a position of danger they would not have faced otherwise. *Reed v. Gardner*, 986 F.2d at 1125 (police officers' action in removing one drunk driver and letting another drive home would "not place individuals in a position of danger that otherwise they would not have faced"). *See also Losinski v. County of Trempealeau*, 946 F.2d 544, 550 (7th Cir.1991) (deputy sheriff did not violate due process rights of domestic abuse victim who was shot by husband inside her home while deputy waited outside after accompanying her to her home to retrieve her belongings; deputy's presence did not create danger from victim's husband and state did not force her to go to her home).

▬ Even in the prison setting, where the state has a special obligation to protect inmates from violence at the hands of other prisoners because it "has stripped them of virtually every means of self-protection and foreclosed their access to outside aid," *Farmer v. Brennan*, — U.S. —, —, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994), state officials are liable for injuries committed by other inmates only if they disregard a risk of harm of which they are aware, that is, only if they act or fail to act despite their knowledge of a substantial risk of serious harm. *Id.* at 1978–79, 1981. The undisputed facts show that defendant Chester never had knowledge of a substantial risk of serious harm to any of Jeffrey Dahmer's victims. Dahmer's compliance with his supervision gave her no cause to suspect problems and none of the experts who treated him noticed anything that led them to suspect he was dangerous. Although defendant knew that Dahmer was a sex offender who might commit another crime, she had no particular reason to believe

that he would do so within the privacy of his own home. I conclude that defendant Chester is entitled to summary judgment on plaintiff's federal constitutional claims because plaintiff has failed to adduce any facts that would support his claim that her actions deprived him and his son of their rights to due process.

▬ With the resolution of all of plaintiff's federal claims, it is within the court's discretion to dismiss the remaining state law claims. *Wentzka v. Gellman*, 991 F.2d 423, 425 (7th Cir.1993). Indeed, it is the normal course to do so if the federal claims are dismissed before trial. *Id.* at 425. However, dismissal is not mandated in every instance. It is not required if, as in this case, the correct disposition of the pendent claims is so clear as a matter of state law that the claims can be resolved without further trial proceedings and without having to interpret any unsettled area of Wisconsin law. *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1182 (7th Cir.1993). An additional consideration supports the retention of jurisdiction over the remaining state law claims. Those claims were raised once in federal court in the Northern District of Illinois, refiled in the Circuit Court for Dane County, Wisconsin, and removed from that court to this one. It would be an undue imposition on the parties to require them to go back to circuit court to achieve a final resolution of a case that has lasted too long already.

▬ Defendant Chester is entitled to summary judgment on plaintiff's state law claims because plaintiff failed to allege in his complaint that he had filed a notice of claim that complied with Wis.Stat. § 893.82 and because, even if he were allowed to amend his complaint at this late date, the notice he did file did not comply with the statute. Under Wisconsin law, compliance with § 893.82 is a condition precedent to suit. "A complaint which fails to show compliance with the statute therefore fails to state a claim upon which relief can be granted." *Yotvat v. Roth*, 95 Wis.2d 357, 360, 290 N.W.2d 524, 527 (Ct.App.1980). *See also Ibrahim v. Samore*, 118 Wis.2d 720, 726, 348 N.W.2d 554, 557 (1984) ("Failure to give no-

tice is fatal to the action."). Plaintiff's notice of claim was timely but it did not comply with the statutory requirement that it name "the state officer, employe or agent involved." Plaintiff never identified defendant Chester in the notice of claim, thus depriving the attorney general of the opportunity to investigate the claim against her, as intended by the statute. *Id.* at 727, 348 N.W.2d at 558 (purpose of § 893.82 is to permit attorney general to investigate a claim against employee that might result in judgment to be paid by state under indemnity statute) (citing *Doe v. Ellis,* 103 Wis.2d 581, 589, 309 N.W.2d 375, 378 (Ct.App.1981); *Yotvat,* 95 Wis.2d at 367, 290 N.W.2d at 531).

■ Even if plaintiff had filed a notice of claim that complied with the statute, he has failed to show that defendant is not immune from liability under the doctrine of official immunity, which protects public officers from liability "for damages resulting from their negligence or unintentional fault in the performance of discretionary duties." *Lister v. Board of Regents,* 72 Wis.2d 282, 301, 240 N.W.2d 610, 622 (1976). It is clear that defendant's duties were discretionary. *See C.L. v. Olson,* 143 Wis.2d 701, 723, 422 N.W.2d 614, 622 (1988) (parole agent immune from tort liability because his decision to let parolee drive a car involved evaluation of public policies within regulatory framework that required governmental discretion).

Plaintiff has not responded to defendant's assertion of an official immunity defense. It is possible that he would argue that since Wisconsin's official immunity doctrine applies only to damages by public officials resulting from their negligence or unintentional fault, his allegations of defendant's gross recklessness would deprive her of the statute's protection. It is not necessary to decide whether allegedly reckless acts are covered by the doctrine because the undisputed facts show that plaintiff has adduced no evidence that defendant was reckless (or even negligent) in the performance of her duties. The undisputed facts show that defendant acted conscientiously and carefully. She cannot be held negligent simply because acts occurred that she could not have anticipated in the exercise of ordinary care.

## ORDER

IT IS ORDERED that the motion for summary judgment of defendants State of Wisconsin and Donna Chester is GRANTED and the case against defendants "as yet unnamed probation officers and employees" is DISMISSED for plaintiff's failure to make timely identification of them. The clerk of court is directed to enter judgment for defendants and to close this case.