**ESTATE OF Randy Lonnell BROWN, by its Special Administrator Johnny Lee Brown, Johnny Lee Brown and Maliey Brown, Plaintiffs,**

v.

**John BARIAN in his individual capacity as Assistant Chief of the State of Wisconsin, Department of Corrections, Division of Community Corrections, and**

**Michael J. Sullivan in his individual capacity as Secretary of the State of Wisconsin, Department of Corrections, Defendants.**

No. 98–C–926.

United States District Court, E.D. Wisconsin.

April 2, 1999.

Merrick R. Domnitz, Susan Rosenberg–Domnitz, Mawicki Goisman Rosenberg, Milwaukee, WI, Lawrence G. Albrecht, First Blondis, Albrecht Bangert Novotnak, Milwaukee, WI, for plaintiffs.

Stan Davis, Asst Atty General, for defendant.

## DECISION AND ORDER RE: DEFENDANTS' MOTION TO DISMISS

CALLAHAN, United States Magistrate Judge.

### I. PROCEDURAL BACKGROUND AND THE PLAINTIFFS' COMPLAINT

What happened to 21 year old Randy Brown on August 21, 1997, is every parent's worst nightmare. On that day, according to the complaint filed in this action, Randy Brown, who was attempting to serve as a peacemaker in a street confrontation between Patrick N. Rucker ("Rucker") and others, was shot and killed by Rucker.

The complaint in this action does not, however, name Rucker as a defendant. Instead, the Estate of Randy Lonnell Brown by its Special Administrator Johnny Lee Brown (who is Randy Brown's father), Johnny Lee Brown, individually, and Maliey Brown (Randy Brown's mother) name as defendants John Barian ("Barian"), in his individual capacity as Assistant Chief of the State of Wisconsin, Department of Corrections, Division of Community Corrections, and Michael J. Sullivan ("Sullivan"), in his individual capacity as Secretary of the State of Wisconsin, Department of Corrections. Barian and Sullivan are named as defendants because, as the complaint sets forth, at the time Rucker shot Randy Brown, Rucker was under the custody and control of the Department of Corrections (DOC) pursuant to a two year sentence imposed on him on August 16, 1996, for attempted auto theft. More specifically, Rucker had been sentenced to serve two years in custody under a program called Division of Intensive Sanctions (DIS), with the first year thereof to be served in prison. According to the complaint, DOC officials had specifically recommended to the court that Rucker be sentenced under the DIS program. Rucker was released from prison on January 27, 1997, and was ordered to serve the remainder of his two year sentence under house arrest.

Under the DIS program, all of Rucker's physical movements were electronically monitored by the DOC via an electric bracelet which he was required to wear at all times. A house arrest "alert" was immediately electronically communicated to a DOC monitoring center in Madison, Wisconsin, on each occasion when Rucker went "out of range" or was "missing." Upon receipt of an "alert," the monitoring center was required to immediately notify Rucker's DOC agent that he was in violation of the DIS house arrest sentence. Any violation thereof subjected Rucker to immediate seizure and reimprisonment pursuant to an "apprehension order." (Complaint ¶ 10).

As a requirement of his DIS house arrest sentence, Rucker was ordered to remain within 30 yards of the electronically monitored telephone in his residence. Between January 27 and August 21, 1997, Rucker violated this sentencing requirement 158 times. (Complaint ¶ 11).

Originally, under the DIS program, DOC field correctional officers had been authorized to issue an apprehension order. Sullivan, as DOC Secretary, removed this authority. Subsequently, DOC agents, who also had been authorized to issue an apprehension order, had their authority removed by Sullivan. Later, DOC super-

visors, who also had been authorized to issue an apprehension order, had their authority removed by Sullivan, who then vested exclusive authority in DOC official John Barian to issue apprehension orders for DIS house arrest inmates in the Milwaukee region. (Complaint ¶ 12).

According to the complaint, Rucker's violations of his DIS house arrest sentence were well known to Barian. Rucker's DOC agent and the DOC case supervisor both expressly requested issuance of an apprehension order by Barian on July 15, 1997, because Rucker had violated his DIS house arrest sentence on July 4, 5, 6, 9, 10, and 14, 1997, and his electronically monitored telephone was disconnected on July 14, 1997. Despite this knowledge, Barian "deliberately" refused to authorize an apprehension order to arrest Rucker and return him to prison. (Complaint ¶ 13).

On July 22, 1997, Rucker was "missing" again from about Noon until 10:37 P.M. This violation caused DOC officials to order a 30–day suspension of Rucker's DIS house arrest privilege to leave his residence. However, Barian "deliberately" refused to authorize an apprehension order as a result of this violation. (Complaint ¶ 14).

On August 4 and 10, 1997, Rucker violated both his DIS house arrest sentence and the DOC 30–day suspension order. However, Barian again "deliberately" refused to authorize an apprehension order to seize Rucker. (Complaint ¶ 15).

On August 21, 1997, Rucker again violated both his DIS house arrest sentence and the DOC 30–day suspension order, fled his residence, and shot four people with a Glock semiautomatic pistol. Rucker killed two of his victims, including Randy Brown, who, as stated previously, was attempting

to serve as a peacemaker in a street confrontation between Rucker and others. About three hours after Rucker's shooting spree, the DOC finally issued an apprehension order for Rucker which it sent to the City of Milwaukee Police Department for enforcement. Rucker voluntarily surrendered on August 24, 1997. (Complaint ¶ 16).

According to the plaintiffs' complaint, Barian "deliberately" refused to order the reimprisonment of Rucker at any time prior to the murder of Randy Brown exclusively for arbitrary reasons of administrative convenience. Again, according to the complaint, Barian exhibited deliberate indifference to the danger which Rucker posed to the public as evidenced by Rucker's criminal history[1] and his persistent and defiant contempt of his house arrest sentence and the 30–day DOC suspension of any privilege to leave his residence. Barian's failure to issue an apprehension order in the face of 158 violations constituted "a de facto, though unauthorized, release of Rucker from his court-ordered prison sentence." (Complaint ¶ 18).

In their complaint, the plaintiffs allege that, as DOC Secretary, Sullivan established and implemented DOC policy, practice, procedure, and custom whereby inmates, including Rucker, were not to be apprehended and returned to prison for violation of their DIS house arrest sentences and suspension orders unless the inmate was contemporaneously engaged in criminal conduct or was perceived by DOC officials to pose an imminent threat of violence. Secretary Sullivan also established and implemented a de facto DOC policy, practice, procedure, and custom whereby inmates, including Rucker, who

---

1. According to the complaint, Rucker had been convicted of strong-armed robbery on October 22, 1994, and was sentenced to one year probation. On April 18, 1995, he was convicted of reckless injury. On May 23, 1996, he was convicted of indecent exposure. These three convictions took place in Milwaukee County Children's Court. On November 3, 1995, Rucker was convicted in Milwaukee County Circuit Court of fleeing from a police officer and was sentenced to four months in prison and three years probation. On June 30, 1996, Rucker turned 18 years of age. As stated previously, on August 16, 1996, while on probation, Rucker was convicted in Milwaukee County Circuit Court of attempted auto theft. (Complaint ¶ 9).

were subject to reincarceration for violations of DIS house arrest sentences and suspension orders, arbitrarily were authorized to remain free from apprehension so long as DOC officials determined, as a matter of cursory administrative convenience, that prison overcrowding in Wisconsin would create additional administrative work in locating an available cell. At all relevant times, however, a jail or prison cell was available for Rucker had the defendants authorized his apprehension prior to his murder of Randy Brown. (Complaint ¶ 19).

The plaintiffs further allege that these DOC policies, practices, procedures, and customs exhibited reckless disregard of public safety and of the defendants' duty to protect the public from the inherent and known danger which Rucker posed while he was in open and contemptuous violation of his DIS house arrest sentence and the 30–day suspension order. According to the complaint, as Rucker's flouting of his DIS house arrest sentence and his 158 violations thereof demonstrate, these DOC policies, practices, procedures, and customs established and implemented by Sullivan authorized and tolerated the reckless physical release of inmates into the community without safeguards for the public's safety thereunder. (Complaint ¶ 19).

Rucker was convicted of the homicide of Randy Brown in Milwaukee County Circuit Court. As a direct consequence of Rucker's homicide of Randy Brown while in DOC custody, the DOC terminated the DIS program. (Complaint ¶ 20).

In their complaint, the plaintiffs assert claims both under federal law and state law. Their federal claim is under 42 U.S.C. § 1983 for the violation of Randy Brown's substantive due process rights under the Fourteenth Amendment. Their state law claims include a claim by Randy Brown's estate for the pain and suffering Randy Brown incurred as a result of being shot, and a wrongful death claim brought by his parents.

In lieu of filing an answer to the plaintiffs' complaint, the defendants filed a motion to dismiss under Rule 12, Federal Rules of Civil Procedure, arguing that the complaint fails to state a claim upon which relief can be granted against them under either federal or state law. More specifically, as to the federal civil rights claim, they argue that the allegations of the complaint fail to set forth facts to support a claim that the defendants violated Randy Brown's constitutional rights; that the claim against them is barred by qualified immunity; and, that the plaintiffs' complaint does not allege sufficient facts to support anything more than negligence on the part of the defendants, and negligence does not support liability under § 1983.

With respect to the state law claims, the defendants argue that the suit is barred by "discretionary immunity"; that the claim against Barian is barred by the plaintiffs' having failed to name Barian in their notices of claim under § 893.82, Wis.Stats.; and, that Johnny Lee Brown and Maliey Brown, as the parents of Randy Lonnell Brown, have no standing to bring a wrongful death claim.

The defendants' motion has now been fully briefed and is ready for resolution. The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and Rule 73(b) of the Federal Rules of Civil Procedure. Jurisdiction in this court is proper pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1367. For the reasons which follow, the defendants' motion to dismiss is **GRANTED,** at least in part.

## II.  ANALYSIS

As stated previously, the defendants have filed a motion to dismiss under Rule 12, Federal Rules of Civil Procedure. Such being the case, I must accept as true all of the plaintiffs' well-pleaded factual allegations and inferences reasonably drawn from them. *Hentosh v. Herman M. Finch Univ. of Health Sciences/The Chicago Med. School,* 167 F.3d 1170, 1173 (7th Cir.1999); *Gastineau v. Fleet Mortgage Corp.,* 137 F.3d 490, 493 (7th Cir.1998);

*Yeksigian v. Nappi,* 900 F.2d 101, 102 (7th Cir.1990). The plaintiffs' claim must survive if "relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King and Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). **See also** *Swofford v. Mandrell,* 969 F.2d 547, 549 (7th Cir.1992). Stated another way, a motion to dismiss "should not be granted unless it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief." *Thomason v. Nachtrieb,* 888 F.2d 1202, 1204 (7th Cir. 1989) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

Bearing this standard in mind, I will first address the adequacy of the complaint to the extent that it purports to allege a federal civil rights claim under 42 U.S.C. § 1983. This is because resolution of that question against the plaintiffs may be dispositive. After all, if the plaintiffs' federal civil rights claim is dismissed, 28 U.S.C. § 1367(c)(3) may be invoked, the result of which would be to have the plaintiffs pursue their state law claims in state court. **See,** *Payne v. Churchich,* 161 F.3d 1030, 1043 (7th Cir.1998) ("[w]hen the district court dismisses all federal claims before trial, the usual and preferred course is to remand the state claims to the state court unless there are countervailing considerations.").

**A. Plaintiffs' Section 1983 Claim**

■ To state a claim under 42 U.S.C. § 1983, a plaintiff must allege facts sufficient to show that: (1) the defendants deprived him of a right secured by the Constitution or laws of the United States; and, (2) the defendants acted under color of state law. *Payne,* 161 F.3d at 1038; *Reed v. City of Chicago,* 77 F.3d 1049, 1051 (7th Cir.1996). In this case, the defendants do not contest that they acted or failed to act under color of state law. Rather, they claim that the plaintiffs have failed to set forth a claim for deprivation of Randy Brown's constitutional rights. They also claim that, in any event, they

are shielded from liability by the doctrine of qualified immunity.

In *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Supreme Court counseled that, as a threshold matter, a court ought to review the presented claims to determine the specific constitutional right allegedly infringed. This determination identifies "the appropriate analytical lens through which facts are to be viewed." *Payne,* 161 F.3d at 1040, citing *Wilson v. Williams,* 83 F.3d 870, 874 (7th Cir.1996). In their brief, the plaintiffs state clearly that it is Randy Brown's substantive due process rights that they claim to have been infringed by Barian and Sullivan. Thus, it is the law of substantive due process that will be applied in analyzing the plaintiffs' § 1983 claim.

■ At its core, the plaintiffs' civil rights claim is based on a theory of liability that finds fault with the defendants' failure to take Rucker off the street and place him back into prison where he would pose no danger to the public at large. They claim that by "deliberately" refusing to authorize an apprehension order to arrest Rucker, even in the face of his 158 DIS violations, the defendants, both state actors, "created a danger or rendered the victim [Randy Brown] more vulnerable to an existing danger." (Plaintiffs' Brief p. 5). By engaging in such conduct, the defendants exposed themselves to liability for the criminal actions of Rucker.

Whether the defendants' conduct, as alleged, can support a § 1983 claim for a violation of Randy Brown's substantive due process rights requires a legal analysis that begins with the Supreme Court's decision in *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). In *DeShaney,* the United States Supreme Court emphasized that the purpose of the Constitution "was to protect the people from the State, not to ensure that the State protected them from each other." *Id.* at 196, 109 S.Ct. at 1003. Joshua

DeShaney, who was five years old, was beaten and rendered profoundly retarded by his father, with whom he lived. Social workers and other local officials had received complaints that the father was abusing the boy, but they did not remove him from his father's custody. After he was beaten for the last time, Joshua and his mother filed a federal lawsuit in which they claimed that Joshua's substantive due process right to liberty was abridged when the officials failed to intervene to protect him from his father. The United States Supreme Court ultimately held that the State's failure to protect an individual against private violence does not constitute a violation of the due process clause.

The Court also rejected the contention that the state officials had entered into a "special relationship" with Joshua because the officials knew he faced a special danger from his father, proclaimed their intention to protect him, and thus had a duty to do so in a reasonably competent fashion. A special relationship exists, the Court said, when "the State takes a person into its custody and holds him there against his will ...", most often in a prison or mental hospital, not under circumstances like those present in *DeShaney*.

■ In *DeShaney*, however, the Supreme Court left open the possibility that a constitutional violation might occur if the state were to create a danger that deprives an individual of Fourteenth Amendment rights. This "state created danger" theory of liability has four elements: (1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the state and the plaintiff; and (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur. *Hodgson v. Mississippi Department of Corrections*, 963 F.Supp. 776, 794 (E.D.Wis.1997). The Seventh Circuit accepted the "state created danger" theory in such cases as *Losinski v. County of Trempealeau*, 946 F.2d 544 (7th Cir.1991);

*Ross v. United States*, 910 F.2d 1422 (7th Cir.1990); and *White v. Rochford*, 592 F.2d 381 (7th Cir.1979).

It is under this "state created danger" theory that the plaintiffs attempt to proceed in this case. After all, there clearly was no "special relationship" between the state and Randy Brown. Randy Brown was not in any fashion in the custody of the state, which, if he had been, would have imposed on the state an obligation to protect him precisely because it limited his ability to care for himself. **See, for example,** *Swofford v. Mandrell*, 969 F.2d 547 (7th Cir.1992) (the victim was a prisoner in state custody); *Estate of Cole v. Fromm*, 94 F.3d 254 (7th Cir.1996) (the victim was a pretrial detainee); and, *Billman v. Indiana Department of Corrections*, 56 F.3d 785 (7th Cir.1995) (the victim was a prisoner).

In support of their argument, plaintiffs cite a host of cases. Among those upon which they rely, the principle one from the Seventh Circuit is *Reed v. Gardner*, 986 F.2d 1122, 1125 (7th Cir.) (rehearing en banc denied), cert. denied 510 U.S. 947, 114 S.Ct. 389, 126 L.Ed.2d 337 (1993). According to the complaint in *Reed*, Richard Reed was driving his automobile on September 11, 1988. His wife, who was eight months pregnant, sat next to him and their young daughters sat in the back with their grandparents. Larry Rice was driving south on the same road when he crossed the center line and collided head-on with the Reed's car. Rice was intoxicated at the time of the crash and was being pursued at high speed by a defendant deputy sheriff. Larry Reed's wife died of her injuries and the other passengers in the vehicle suffered extensive injuries.

Approximately two hours before the accident, other defendant deputy sheriffs had arrested one Cathy Irby. They left Larry Rice, who had been riding in Irby's car, inside the car with Irby's car keys, although they knew or should have known that Rice was intoxicated.

In reversing the district court's dismissal of the plaintiffs' civil rights claim, the Seventh Circuit noted that *"DeShaney,* however, leaves the door open for liability in situations where the state creates a dangerous situation or renders citizens more vulnerable to danger." *Reed,* 986 F.2d at 1125. In the view of the court, "Police Officers who remove sober drivers and leave behind drunk passengers with keys may be said to create a danger or at least render others on the road more vulnerable. Certainly the Reeds are worse off with a drunk driver heading toward them than a sober one. The complaint accuses ... defendants ... of infringing the rights of the [plaintiffs] by creating a dangerous situation and failing to protect them from it. This case, therefore, is distinguishable from cases in which state actors had no hand in creating a danger but 'stood by and did nothing when suspicious circumstances dictated a more active role for them.'" *Id.*

The court went on to note that, although it had been hesitant to find § 1983 liability outside the custodial setting, the plaintiffs in *Reed* "may state claims for civil rights violations if they allege state action that creates, or substantially contributes to the creation of, a danger or renders citizens more vulnerable to a danger than they otherwise would have been." *Id.* at 1126. In the view of the court, "[t]he officers in this case initiated the state action, by arresting Irby and removing her from the car. That state intervention created the dangerous condition, a drunk driver on the road. The defendants' lack of direct contact with the appellants does not necessarily preclude this action against them. By removing a safe driver from the road and not taking steps to prevent a dangerous driver from taking the wheel, the defendants arguably changed a safe situation into a dangerous one. The dangers presented by drunk drivers are familiar and specific; in addition, the immediate threat of harm has a limited range and duration ... When the police create a specific danger, they need not know who in particular will be hurt. Some dangers are so evi-

dent, while their victims are so random, that state actors can be accountable by any injured party. Despite the two hour time lapse and the distance between the place of Irby's arrest and the car accident, the events are not sufficiently attenuated to relieve the defendants of § 1983 liability.... This case presents an indisputably close question. The defendants' alleged actions do not involve the same type of shocking conduct as in *Nishiyama [v. Dickson County,* 814 F.2d 277 (6th Cir. 1987) ] where deputies gave a fully equipped, clearly marked patrol car to a felon in custody and ignored the risks to motorists even after they were told that he was stopping cars at the roadside. These defendants, however, did engage in reckless conduct similar to the officer who left a passenger alone and on foot in a high crime area *(Wood v. Ostrander,* 879 F.2d 583 (9th Cir.1989) *cert. denied,* 498 U.S. 938, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990)) or the officers who arrested a driver and left young children stranded on the highway *(White v. Rochford,* 592 F.2d 381 (7th Cir.1979)). While they did not create the danger by buying Rice drinks and providing him with a car, they did take action under color of state law which rendered the Reeds and other motorists on Route 130 vulnerable to a dangerous driver." *Id.* at 1126–27.

By contrast, in *Bowers v. DeVito,* 686 F.2d 616 (7th Cir.1982) (a pre-*DeShaney* case), the Seventh Circuit stated:

There is a constitutional right not be murdered by a state officer, for the state violates the Fourteenth Amendment when its officer, acting under color of state law, deprives a person of life without due process of law... But there is no constitutional right to be protected by the state against being murdered by criminals or madmen. It is monstrous if the state fails to protect its residents against such predators but it does not violate the due process clause of the Fourteenth Amendment, or, we suppose, any other provision of the Constitution.

The Constitution is a charter of negative liberties; it tells the state to let people alone; it does not require the federal government or the state to provide services, even so elementary a service as maintaining law and order. Discrimination in providing protection against private violence could of course violate the equal protection clause of the Fourteenth Amendment. But that is not alleged here. All that is alleged is a failure to protect Ms. Bowers (the plaintiff) and others like her from a dangerous madman, and as the State of Illinois has no federal constitutional duty to provide such protection its failure to do so is not actionable under section 1983.

We do not want to pretend that the line between action and inaction, between inflicting and failing to prevent the infliction of harm, is clearer than it is. If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit. It is on this theory that state prison personnel are sometimes held liable under section 1983 for the violence of one prison inmate against another... But the defendants in this case did not place Ms. Bowers in a place or position of danger; they simply failed adequately to protect her, as a member of the public, from a dangerous man. That failure may be actionable under the common law of Illinois....

We express no view on the plaintiff's rights under the tort law of Illinois. A state may if it wants recognize positive duties of care and make the breach of those duties tortious. But the only duties of care that may be enforced in suits under section 1983 are duties founded on the Constitution or laws of the United States; and the duty to protect the public from dangerous madmen is not among them.

*Bowers,* 686 F.2d at 618–19.

In the wake of *DeShaney,* courts in both the Eastern and Western Districts of Wisconsin have, on factual presentations not entirely different from those in the case at bar, ruled that victims of violent acts committed by third parties over whom the state had some control could not sue the state actors for a violation of the victim's substantive due process rights.

In *Weinberger v. State of Wisconsin,* 906 F.Supp. 485 (W.D.Wis.1995), U.S. District Judge Barbara Crabb dismissed on summary judgment the plaintiff's claim against Jeffrey Dahmer's state probation officer. The plaintiff's son was one of Dahmer's victims. The plaintiff alleged that the defendant acted unreasonably, in a grossly negligent manner and with reckless disregard for the safety of persons in the class of Dahmer's abuse victims by mismanaging Dahmer's supervision. Specifically, the plaintiff alleged that Dahmer's probation officer "failed to visit Dahmer's residence as she was required to do while he was on probation, failed to act on indications that Dahmer was about to have a nervous breakdown and would engage in abuse again, and failed to make any attempts to obtain counseling for Dahmer." *Weinberger,* 906 F.Supp. at 487.

In dismissing the plaintiff's claim against the probation officer, Judge Crabb ruled the plaintiff's claim "that defendant's recklessly inadequate supervision of Dahmer subjected plaintiff's son to the deprivation of his life without due process of law" was a contention that could not succeed. "Plaintiff's son was not murdered by defendant but by a third person who was not acting on behalf of the state ... State actors can be liable only if they create the dangerous situation or render the victims more vulnerable to harm." *Id.* at 492. Judge Crabb went on to note that, "[e]ven if it is true that plaintiff's son would not have been murdered but for defendant's failure to visit Dahmer's apartment unexpectedly, her failure is not a cause that has legal significance.... Plaintiff must prove a different kind of cause in order to recover from defendant. He must prove that the supervision of Dahmer

created or increased the harm to Dahmer's victims or somehow made them more vulnerable. In fact, the victims were in no worse position than if the state had never taken on Dahmer's supervision. They had not been taken into custody or otherwise limited in their ability to care for themselves and they had not been placed affirmatively into a position of danger they would not have faced otherwise." *Id.* at 492–93.

Similarly, in *Hodgson v. Mississippi Department of Corrections,* 963 F.Supp. 776 (E.D.Wis.1997), United States District Judge Thomas Curran granted the defendants' motion to dismiss the plaintiff's third amended complaint. In *Hodgson,* the plaintiff sued a number of defendants, including the Mississippi Department of Corrections, its former Commissioner and its former Interstate Compact Administrator claiming, inter alia, that they caused his daughter's death by failing to comply with the Uniform Act for Out–of–State Parolee Supervision when one John Bracey Smith, a parolee under their supervision, relocated to Wisconsin. *Id.* at 781–82.

In the process of analyzing whether the defendants were entitled to qualified immunity, Judge Curran examined whether the plaintiff had properly alleged a constitutional violation against the defendants.

In this case, the dispositive issue with regard to qualified immunity is whether the Plaintiff has alleged a cognizable section 1983 claim at all. Hodgson maintains that the state officials caused his daughter's death in violation of the right to life which is secured by the Fourteenth Amendment. In order to prevail on this theory, the Plaintiff would have to prove that John Bracey Smith requested a transfer to Wisconsin and that [the defendants] intentionally failed to warn, or to supervise, or to comply with the Uniform Act for Out–of–State Parolee Supervision and that this failure to act caused the death of Monique Hodgson. . . .

Even if Hodgson could prove these allegations of nonfeasance and the requisite state of mind of the Defendants, the question is whether this conduct violated the Fourteenth Amendment rights of himself and his daughter.

*Hodgson,* 963 F.Supp. at 792–93.

Judge Curran found that it did not. First, he found that the "special relationship" required by *DeShaney* did not exist between Monique Hodgson and the Mississippi corrections officers. No custodial relationship existed between them and the State of Mississippi had not affirmatively restrained her freedom to act on her own behalf. *Id.* at 794. Secondly, Judge Curran found that the "state created danger" theory contemplates some contact such that the plaintiff's decedent would have been a foreseeable victim of the defendants' failure to act. And because there was no allegation that the defendants were aware that Monique Hodgson, as distinguished from the public at large, faced any special danger, the "state created danger" theory of liability left available by *DeShaney* did not apply.

To be sure, there are some cases, such as *Cornelius v. Town of Highland Lake, Alabama,* 880 F.2d 348 (11th Cir.1989) that would, at first glance, seem to support the plaintiff's claim in the case at bar. In *Cornelius,* two prison inmates, while assigned to a community work squad program in Highland Lake, Alabama, abducted Ms. Cornelius from the Town Hall and terrorized her for three days. She brought an action pursuant to 42 U.S.C. § 1983 alleging that the defendants (the Town of Highland Lake, Alabama, several of its city officials, and various members of the Alabama Department of Corrections) had violated her constitutionally protected liberty interest. In *Cornelius,* the court reversed the district court's grant of summary judgment to the defendants, finding that Ms. Cornelius had presented a genuine issue as to: (1) whether a "special relationship" existed between the defendants and her; and, (2) whether the defen-

dants were aware that she faced a "special danger" from the work squad inmates. Specifically, Ms. Cornelius worked in the Town Hall. If she wished to continue to serve as the Town Clerk she had to work in the environment created by the town officials, one that included routine exposure to prison inmates who were allowed to work around the Town Hall. *Cornelius,* 880 F.2d at 355. Such being the case, the court found that Ms. Cornelius may very well have had a "special relationship" with the defendants, akin to that of a person, such as a prisoner, who had been deprived of the right to protect him or herself by virtue of the setting in which the state had placed her. In so ruling, however, the court was quick to add that, "absent the [special] relationship, 'the due process clause of the Constitution does not protect a member of the public at large from the criminal acts of a third person, even if the state was remiss in allowing the third person to be in a position in which he might cause harm to a member of the public...'" *Cornelius,* 880 F.2d at 353, citing *Wright v. City of Ozark,* 715 F.2d 1513, 1515 (11th Cir.1983).

So how do the plaintiffs' claims in this action fit into the picture, given this jurisprudential back drop? Does their complaint set forth a viable § 1983 claim in the class of such cases as *Cornelius* and *Reed?* Or, does it set forth a claim that, like those asserted in *DeShaney, Weinberger,* and *Hodgson,* is destined to fail? Although the factual scenario set forth in the plaintiffs' complaint is nothing short of tragic (and one that seems to be more common as our society becomes increasingly more violent), it is nevertheless one that, in my opinion, cannot support a § 1983 substantive due process claim.

To begin with, what distinguishes *Cornelius* from the case at bar, in my view, is the "special relationship" that the ultimate victim, Ms. Cornelius, had with the state actors in that case. In the case at bar, Randy Brown had no such "special relationship." Indeed, he was totally unknown to the state actors, which is to say that Randy Brown was a random victim of Rucker's violence.

In this regard, his legal status is similar to that of the plaintiff decedent in *Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). In *Martinez,* the Supreme Court held that the murder of a 15 year old girl by a parolee five months after his release from prison did not subject the parole board to liability under § 1983. The court found that the actions of the state did not "deprive" the victim of a constitutionally protected right. It ruled that the parolee was not an agent of the state, that the parole board did not know that the decedent, as distinguished from the public at large, faced any special danger, and that the death was too remote a consequence of the parole board's action to hold them responsible under the federal civil rights law. *Id.*

To be sure, in the case at bar, the plaintiffs allege that "subsequent to his physical release under the DIS program, Mr. Rucker remained under the custody and control of the DOC pursuant to the two year sentence imposed upon him on August 16, 1996." (Complaint ¶ 9). For all intent and purposes, however, his status of being under electronically monitored house arrest was not materially different than that of being a parolee, like the murderer in *Martinez.* And although the complaint in this case alleges that Rucker, on 158 occasions, violated the terms of his DIS program by being "out of range" or "missing," nowhere in the complaint is it alleged that on any of those occasions Rucker engaged in any criminal conduct, much less criminal conduct directed at Randy Brown. In other words, nowhere do the plaintiffs allege that the defendants knew Randy Brown faced any special danger from Rucker and that, therefore, some constitutional duty was owed to Randy Brown to protect him from Rucker.

But, what about *Reed?* After all, in that case the Seventh Circuit found the complaint sufficient even though there was no allegation that the plaintiffs had a "special

relationship" with the defendants. Moreover, the complaint did not allege that the defendants were aware, or had any reason to be aware, of any special danger to the Reeds, and the Reeds alone, which would be created by leaving the car keys with Larry Rice. In other words, that the victims of Larry Rice's drunk driving might have been "random" did not render the plaintiffs' civil rights claim vulnerable to a motion to dismiss.

In my view, what distinguishes the complaint in this case from the allegations in *Reed* is what the Seventh Circuit called the "familiar and specific" dangers posed by drunk drivers, which dangers were of an immediate nature, and of limited range and duration. *Reed*, 986 F.2d at 1127. Indeed, the court defined the potential victims as "the Reeds and other motorists on Route 130." *Id.* In the case at bar, Randy Brown was no more vulnerable to Rucker's unforeseen, random acts of violence than any other member of the public. In other words, unlike the Reeds or other motorists on Route 130 who were (literally) foreseeably in the path of Larry Rice's travel, Randy Brown's running into Rucker on August 21, 1997, was totally unforeseen and unpredictable.

Furthermore, in *Reed* the defendants knew that they were leaving the automobile keys with a man who was intoxicated. There is no allegation that here the defendants knew Rucker even owned a pistol, much less that he would be carrying one on August 21, 1997. Indeed, there is no indication that, other than being "out of range" on 158 occasions, Rucker engaged in any criminal conduct on any of those 158 occasions.

■ In the end, the *Reed* decision is compatible with the principle that, even absent a "special relationship" with the victim, state actors can be found liable under § 1983 pursuant to the "state created danger" theory of liability. This is so because, in *Reed*, the harm that was ultimately caused was foreseeable and fairly direct; the state actors, at least arguably, acted in willful disregard for the safety of the plaintiffs; and, the state actors used their authority to *create* an opportunity that otherwise would not have existed for the third party's "crime" to occur. **See** *Hodgson*, 963 F.Supp. at 794. After all, if the state actors had not literally left the car keys with Larry Rice, he would not have been able to drive down Highway 130.

■ But the same cannot be said in the instant case. Here, the harm cannot be said to have been foreseeable and a direct consequence of the defendants' failure to take Rucker into custody. Nor did the defendants' failure to take him into custody "create an opportunity that otherwise would not have existed for" Rucker's crime to occur. To be sure, if the defendants had taken him into custody, he would not have had an opportunity to commit a crime. But this is not the same as "creating" the opportunity for it to occur. Creating an opportunity for it to occur connotes "affirmative conduct," as opposed to merely standing by and doing nothing even when "suspicious circumstances dictated a more active role for the state actors." *See Reed*, 986 F.2d at 1125, n. 1.

■ Perhaps the defendants should have taken more aggressive steps to take Rucker into custody. And perhaps the plaintiffs' state law claims asserting that they had a duty to do so may be viable. But, as the court stated in *Bowers*, supra, "[a] state may if it wants recognize positive duties of care and make the breach of those duties tortious. But the only duties of care that may be enforced in suits under section 1983 are duties founded on the Constitution or laws of the United States; and the duty to protect the public from dangerous madmen is not among them." *Bowers*, 686 F.2d at 619.

In conclusion, I am persuaded that the plaintiffs' § 1983 claim cannot survive. In my view, relief could not be granted under any set of facts that could be proved consistent with the allegations in their complaint. **See** *Hishon*, 467 U.S. at 73, 104

S.Ct. at 2232. For that reason alone, the defendants' motion to dismiss the plaintiffs' § 1983 claim should be granted. There is, however, a further reason why it should be granted.

■■■■ As stated previously, the defendants in this case claim that they are shielded from liability by virtue of qualified immunity. Government officials may raise qualified immunity as an affirmative defense to actions brought against them under 42 U.S.C. § 1983. See *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 1923–24, 64 L.Ed.2d 572 (1980). In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court held that, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. Under this "objective test," a court must determine whether a reasonable official could have believed his or her conduct was unlawful "in light of clearly established law and the information [the officials] possessed" at the time. *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3039–40, 97 L.Ed.2d 523 (1987).

In the Seventh Circuit, courts use a two-step approach for analyzing a defendant's qualified immunity defense: "(1) Does the alleged conduct set out a constitutional violation? (2) Were the constitutional standards clearly established at the time in question?" *Kernats v. O'Sullivan,* 35 F.3d 1171, 1176 (7th Cir.1994). My decision that the defendants did not violate the substantive due process rights of Randy Brown has rendered it unnecessary to answer the second prong of the qualified immunity defense question.

■■■■ But even assuming that the plaintiffs' complaint had been found by me to set forth an arguably viable claim under § 1983, I would nevertheless be compelled to find that the defendants in this case are shielded by the doctrine of qualified immu-

nity. After all, even if the plaintiffs' complaint had set out a constitutional violation, the defendants are entitled to the qualified immunity defense unless the constitutional standards were clearly established at the time in question. And before a right is clearly established, it must be sufficiently particularized to put potential defendants on notice that their conduct is unlawful. Once the defendants' actions are defined or characterized according to the specific facts of the case, this characterization is compared to the body of law existing at the time of the alleged violation to determine if constitutional, statutory, or case law shows that the now specifically defined action violated the clearly established law. *Rakovich v. Wade,* 850 F.2d 1180, 1209 (7th Cir.1988) (en banc) cert. denied, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988).

On this point, the plaintiffs face an insurmountable hurdle. Indeed, the defendants' conduct about which the plaintiffs complain occurred during approximately July and August, 1997. Yet that same spring, specifically on April 30, 1997, Judge Curran issued his decision in *Hodgson.* And on facts not entirely dissimilar to those presented in the case at bar, Judge Curran found no substantive due process violation by the Mississippi Department of Corrections, its former Commissioner, and its former Interstate Compact Administrator by their alleged failure to properly supervise a parolee under their supervision. Similarly, the Seventh Circuit's decision of January 31, 1997, in which it affirmed Judge Crabb's decision in *Weinberger,* (see *Weinberger v. State of Wisconsin,* 105 F.3d 1182 (7th Cir.1997)), could not be said to have sent a message that the defendants *did* have a constitutional duty to take affirmative action to get Rucker off the street so that he could not gain access to a firearm and shoot some innocent, unknown third party.

In sum, even assuming I were to find the plaintiffs' complaint to set out a constitutional violation, the constitutional stan-

dards supporting such violation were not clearly established at the time in question. In fact, quite the opposite was true. The net result is that the defendants would, in any event, be entitled to qualified immunity from the plaintiffs' substantive due process claim under § 1983.

### B. Plaintiffs' State Law Claims

That I have decided to dismiss the plaintiffs' federal claim under § 1983 does not resolve all issues in this case. As stated previously, the plaintiffs have also alleged state law claims. I believe the appropriate course to take with respect to those claims, however, is to dismiss them without prejudice so that the plaintiffs' might refile such claims in state court.

28 U.S.C. § 1367 provides, in pertinent part,

(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution...

\* \* \* \* \* \*

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—

\* \* \* \* \* \*

(3) The district court has dismissed all claims over which it has original jurisdiction...

Now that I have dismissed the plaintiffs' federal claim under § 1983, I see no reason to retain jurisdiction to resolve the plaintiffs' state law claims. This is not a situation where the parties have engaged in extensive discovery and have otherwise spent a lengthy period of time litigating this case in federal court. To the contrary, the defendants have not yet even answered the plaintiffs' complaint. And the case is relatively new, having only been filed in September, 1998. Accordingly, I will **DISMISS** the plaintiffs' state law claims, without prejudice, to refile the same in state court. See *Payne* 161 F.3d at 1043.

### III. CONCLUSION

In conclusion, and for all the foregoing reasons,

**IT IS HEREBY ORDERED** that the defendants' motion to dismiss the plaintiffs' federal claim under § 1983 is **GRANTED;**

**IT IS FURTHER ORDERED** that the plaintiffs' state law claims are **DISMISSED,** without prejudice to refile the same in state court;

**IT IS FURTHER ORDERED** that this action be **DISMISSED.**

**SO ORDERED.**